(No. 14458.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* RAY J. MARTIN, Plaintiff in Error.

*Opinion filed October 21, 1922.*

1. CRIMINAL LAW—*when method of obtaining identification affects weight of the evidence.* Identification by persons who were at the scene of the crime should be made at a time when the accused is in the company of others who are unknown to such persons, and the weight to be given evidence of identification is affected by the fact that the police notified the witnesses to come to the police station to identify a person who they thought had committed the crime and brought the accused alone into the presence of the witnesses instead of requiring them to pick him out from a number of persons. ,

2. SAME—*when conviction depending on identification of defendant must be affirmed.* It is the province of the jury to weigh the evidence of identification of the accused by the witnesses for the People and the evidence of alibi presented by the defendant, and in the absence of errors of law a judgment of conviction will not be reversed by the Supreme Court unless it clearly appears there is a reasonable doubt of defendant's guilt.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JOSEPH H. FITCH, Judge, presiding.

LEWIS A. HAUSCHILD, (THOMAS E. SWANSON, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and EDWARD C. FITCH, (EDWARD E. WILSON, and CLYDE C. FISHER, of counsel,) for the People.

Mr. JUSTICE STONE delivered the opinion of the court:

Plaintiff in error, Ray J. Martin, and Clarence Sponagel, were convicted of robbing Elof Lindberg of his automobile and other property in the city of Chicago at about 10:30 on the night of May 14, 1921. They were tried to-

gether and both were sentenced to the penitentiary. They sued out a writ of error to this court. At the last April term judgment as to both was affirmed. In the June term following, on a petition for rehearing, this court adhered to its original decision as to Sponagel but granted a rehearing to Martin, plaintiff in error here. *People* v. *Martin,* 303 Ill. 233.

The facts concerning the crime charged in the indictment are fully set out and discussed in the opinion just referred to, and it is unnecessary to discuss them further here. The errors assigned here are as to the modification of certain instructions and refusal of others offered by plaintiff in error; remarks on the part of the State's attorney on the trial; and that as to plaintiff in error the verdict is not sustained by the evidence.

The first two of the objections were disposed of on the former hearing, it being held by this court in that case that no error was committed by the court in modifying or refusing instructions, and that while the arguments of the State's attorney complained of were not proper they were promptly stopped and held to be improper by the court, and in view of the fact that no other objection was raised to the argument of the State's attorney, the holding that the defendant there was not prejudiced by those remarks applies equally here, as the argument of counsel could not apply to one defendant more than the other. The remaining contention to be considered is that the verdict of the jury was not sustained by the evidence.

Plaintiff in error's defense was that of an alibi, and it is earnestly urged that the State's witnesses who identified him as being one of the men seen at the scene of the robbery were mistaken. He was identified as being one of those participating in the crime by four witnesses: Elof Lindberg, the complaining witness; Carl A. Allen, the man who was with Lindberg in the car at the time of the robbery; and Mr. and Mrs. George E. Carlson, who lived in

that neighborhood and who passed along the street at the time of the robbery. On the other hand, four witnesses, members of the family of the wife of the plaintiff in error, testified clearly and positively that the plaintiff in error was at home at the time the robbery was committed.

Lindberg testifies that he saw the plaintiff in error come out from a doorway near by the store of the witness Allen, where Lindberg had stopped with his car. He identified him as having on a light top-coat and cap. Allen, who was in the machine at the time the robbery started, testified that he saw two men come out of the vestibule of the house next to his store and walk toward the car in which he and Lindberg were seated; that plaintiff in error was one of them, and he described him as being dressed in a light-colored overcoat and cap and that he had a little, short mustache. Both of these witnesses testified to seeing plaintiff in error later at the police station. Carlson testified that as he and his wife were passing the store of the witness Allen their attention was attracted to two men peering out at them from the lighted vestibule of the building next door; that he got a good look at both men; that he saw plaintiff in error standing there; that Martin had on a light top-coat; that it looked like a light tan or gray; that his attention was directed towards them by the manner in which they were looking out; that he watched them as he went by and even as he passed he turned his head, and that he had an opportunity to see the men in the doorway and positively identified Martin as being one of them. He also testified that he saw Martin again at the police station and there told Martin that he saw him that night in the hallway, but the lieutenant of police told him to keep still. The testimony of Mrs. Carlson was to the same effect. She positively identified Martin as being one of the two men in the hallway. She also testified that she saw Martin at the police station after his arrest; that someone called up from the station and told her that they thought they had the man

who robbed Lindberg and for her and her husband to come down; that they went to the station; that nothing was said after they arrived there as to whom they were to see; that Martin was brought in alone by the police. She also testified that she knew she was going down to the police station for the purpose of determining whether or not the man they had in custody was the man she had seen that night; that while he did not then wear a mustache, she was positive then and at the time of her testimony that he was the man she saw on the night of the robbery. These witnesses were quite positive in their identification, some of them testifying that they commented on the fact that he had a small mustache on the evening of the robbery and when seen at the police station his mustache had been shaved off.

Michael O'Malley, a police officer, testified that he found the automobile on May 16 at 936 East Fifty-second street and took it to the Hyde Park police station; that the place where the machine was found was about 200 feet from 5215 South Ellis avenue, where Martin lived.

On behalf of Martin, Mrs. Schoff, his mother-in-law, who, it appears, is a substitute teacher in the public schools of the city of Chicago, testified that she lived in and owned the premises at 5215 South Ellis avenue and that Martin and his wife and child lived there with witness and her family. She testified that Martin's wife went to Lake Geneva, Wisconsin, on the afternoon of May 14, by train; that Martin took his wife and daughter to the train and returned to the house about 7:00 or 7:30 in the evening; that witness' daughter Margaret prepared his dinner; that Martin remained in the house all evening; that she talked with him frequently during the evening; that he read awhile, played solitaire and did some writing; that he retired close to ten o'clock and did not leave the house; that she retired about 11:00 or 11:30; that Martin and the witness' son, Ray, had arranged to play golf the next morning and had arranged to arise at 2:30 A. M. to go to the golf links; that she heard

Martin go down-stairs at that hour in the morning and saw him when he returned the next day, about dinner time. She fixes May 14 as the time because of her daughter going to Lake Geneva and that the next day was Whitsunday, a day of celebration in the church of which she was a member. She testified that she remonstrated with her daughter and Martin about going visiting and playing golf on that day, and her daughter told her she would go to church at Lake Geneva. Margaret Schoff, a daughter of the witness Mrs. Schoff and sister-in-law to the plaintiff in error, testified that Martin came home about 7:00 or 7:15 in the evening of May 14 and that she prepared his dinner; that his wife had gone to Lake Geneva; that Martin did not leave the house again that evening. She likewise fixes the day of her sister's visit to Lake Geneva by the following day being Whitsunday. Robert Schoff, brother of Margaret, testified he saw Martin at home about seven o'clock on the evening of May 14; that he had talked with him about his wife going to Lake Geneva to visit his father; that Martin said he was going to play golf the next day and asked the witness to call him at 2:30 the next morning. He also testified that Martin did not leave the house that night. This witness also fixes the date as the day that his sister went to Lake Geneva. Charles Schoff, Martin's father-in-law, testified that Martin was at home that evening; that the witness did not retire until about eleven o'clock, and he likewise fixes the day and date in the same manner as did the balance of the Schoff family.

Martin testified he had no knowledge of the hold-up; that he left the house about two o'clock on May 14 with his wife and daughter to go to the Chicago and Northwestern depot, where they left on a train for Lake Geneva; that after the train had departed he met and talked with Stanley Holmes until about six o'clock, returning home about 7:15 or 7:30; that his sister-in-law, Margaret, prepared dinner for him; that he remained at home all even-

ing and retired shortly after ten o'clock; that he got up about 2:30 in the morning and went to the Jackson Park links, where he played golf until about 11:30 and then returned home. He testified that it was necessary for him to leave home at an early hour in order to play a game of golf by noon, as the golf course was crowded.

As we have seen, the witnesses for the State who identified Martin as one of the men who committed the robbery testified that he at that time wore a small mustache. When he was arrested he had none. The police officer and one other of the State's witnesses testified that when he was asked by the officer when he shaved off his mustache he replied he did it on May 15; that he shaved it off because the boys made fun of him. On the witness stand Martin testified that he shaved off his mustache about four o'clock in the afternoon of May 14 for the reason that he had an opportunity to play baseball, and that his brother had told him that a man with a mustache would not have much opportunity to get a position as a ball player. He does not say where he had the mustache shaved off, but in his testimony he states that he met Stanley Holmes at the station after his wife's train had left, which the evidence shows was about four o'clock. Witnesses for the State also testified that Martin told the police that he was in Lake Geneva on May 14. He admitted that he had made that statement, but said he had told them that because he thought they would go to the place where he lived and bother the family to find out whether or not the statement was true, and he knew it would be time enough to bring them in at the trial of the case.

It will be seen that the testimony of the witnesses for the People conflicts sharply with that of the family of the plaintiff in error concerning the robbery. Nothing appears in the record to cast suspicion upon the good faith or honesty of the witnesses, either for the State or the defense, but it is, of course, evident that the witnesses for both

sides cannot be correct. The robbery which is in dispute took place about 10:30 on the evening of May 14. If the witnesses for the plaintiff in error are correct he was at his home at that time. On the other hand, four witnesses, who, so far as the record is concerned, have no reason to desire to injure plaintiff in error, have positively identified him as having been at the scene of the robbery and participated therein. The car taken was found within 200 feet of his residence. It is admitted that until four o'clock on the day of May 14 plaintiff in error wore a mustache of the character testified to by the State's witnesses. It is admitted that he owned and wore a light-colored top-coat and cap, though the State's witnesses and those for the defense do not agree as to the color of the cap. The identification in this case is affected by the fact that the police, in notifying the State's witnesses to come to the station for that purpose, said they thought they had one of the men who committed the robbery. Instead of the witnesses being required to pick out plaintiff in error from a number of persons he was brought alone into their presence. As was said in the case of *People v. Crane,* 302 Ill. 217, such means of securing identification of a person charged with crime has a tendency to weaken the value of the identification, for the reason that witnesses may be influenced by the suggestion arising out of the fact that the police think they have the right man. Such identification should be made when the person to be identified is in the company of others who are unknown to the witnesses. While this was a matter going to the weight and credibility of the testimony of these witnesses, the identification by each was positive. The circumstance of plaintiff in error having a light top-coat; the testimony of some of the State's witnesses that he told the police that he shaved his mustache on May 15, which would be the day after the commission of the robbery, together with the fact that the person taking part in the robbery wore a small mustache; the fact that

the car was found within 200 feet of the plaintiff in error's residence; his statement to the police officers, when arrested, that he was in Lake Geneva on May 14, are all matters which the jury may have considered in determining the weight of the testimony on both sides of the case. The testimony on the part of the defense as to plaintiff in error being at home on the evening of the day of the commission of the crime is equally positive, though unaided by other circumstances appearing in the proof.

Counsel for plaintiff in error very earnestly urge that this is a case of mistaken identity; that the plaintiff in error had nothing to do with the crime., As we have seen, there is no error in the record upon which a reversal can be based. The identification and whereabouts of the plaintiff in error on the night of the commission of the crime are questions wholly for the jury. In order to set aside a verdict of the jury it is necessary that this court be convinced that the verdict is contrary to the weight of the evidence. Plaintiff in error, if not guilty, is, indeed, most unfortunate. Either the State's witnesses were mistaken in their identification or plaintiff in error's witnesses were mistaken as to the day on which they testified he was at home. The issue was one peculiarly for the jury. The record contains no errors of law. Even though it might be said that this court, hearing the evidence in the first instance, would have arrived at a different conclusion, yet it cannot be said, under the condition of this record, that the jury were not justified in returning a verdict against plaintiff in error. It becomes the duty of this court, therefore, to affirm the judgment, and the same is done accordingly.     *Judgment affirmed.*