THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HERMAN NOWICKI, Plaintiff in Error.

*Opinion filed April 21, 1928—Rehearing denied June 13, 1928.*

1. CRIMINAL LAW—*when, only, will verdict be disturbed on review.* It is the province of the jury to pass upon disputed questions of fact, and the Supreme Court will not set aside a verdict unless it is clearly apparent that the decision was the result of passion or prejudice or unless it clearly appears from the record that there is a reasonable doubt of the defendant's guilt.

2. SAME—*what instruction defining accessory is proper.* An instruction defining an accessory in the words of the statute is not improper in failing to caution the jury that they must determine whether the defendant was an accessory, where they are fully instructed that they must believe from the evidence that the defendant is guilty beyond a reasonable doubt.

3. SAME—*when conviction on testimony of accomplices will be sustained.* A conviction of the defendant as an accessory solely upon the testimony of accomplices who participated in the actual commission of the crime will not be set aside where the Supreme Court is unable to say that the jury, who saw and heard the witnesses, were not justified in believing their testimony, which is corroborated in essential particulars, and where the record is free from error on the trial.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JOHN J. SULLIVAN, Judge, presiding.

EVERETT JENNINGS, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and JAMES B. SEARCY, (HENRY T. CHACE, JR., and EDWARD E. WILSON, of counsel,) for the People.

Mr. JUSTICE STONE delivered the opinion of the court:

Plaintiff in error was indicted with Louis Victor for the crime of robbery while armed with a gun. The plaintiff in error was found guilty and prosecutes this writ of error.

The first count of the indictment under which plaintiff in error was convicted charged that he robbed Norman D. Kadison of $100 in money, one hundred diamonds of the value of $100 each, thirty-five packages of diamonds of the value of $500 each, certain diamond-studded jewelry, and one watch of the value of $350, of the personal goods and property of Kadison. The evidence of the State all tended to show that plaintiff in error did not personally participate in the robbery but that he was guilty as an accessory before the fact, and if this was proved he is under the statute of this State to be held guilty as principal. No objection is raised to the sufficiency of the indictment nor to errors occurring on the trial other than a complaint made of one instruction. The principal ground on which reversal of the judgment is sought is that the evidence does not justify the conviction of plaintiff in error.

The evidence as to the crime was given by Lawrence Ghere and Arthur McLelland, the two men who robbed Kadison, the complaining witness. Kadison, who is a diamond salesman residing in New York City, registered at the Palmer House, in Chicago, on August 27, 1926, and was assigned to room 1155. He carried unmounted diamonds of the value of approximately $150,000. The robbery occurred on September 2, 1926, in the hallway just as Kadison

was unlocking the door to enter his room. He testified that it was his practice to carry these diamonds upon his person during the day and exhibit them to prospective customers; that he carried them in a specially made vest, with pockets large enough to accommodate the large wallets in which the diamonds were placed; that at the close of the day he would go to his room, remove this vest and place it in a brief case and take the brief case to the office of the hotel and have it deposited in the safe; that in the morning, before calling on his customers, it was his custom to go to the office, secure his brief case, take it to his room, check over the diamonds and put on the special vest in which he carried them; that on September 2 he went to the hotel office and secured the brief case containing the diamonds and returned to his room; that he was in the act of unlocking his door when a man, whom he identified as Ghere, seized him from behind and threw him into the open door of a room next to his own, where, with the assistance of another man whom the complaining witness identified as McLelland, he was tied and gagged and the brief case containing the diamonds taken from him, as well as his watch, approximately $100 in money and other personal belongings; that Ghere, when he assaulted him, drew a gun on him and warned him not to call for help; that he was bound and gagged and placed between two beds in the room and covered with a blanket, and the robbers left, taking his property.

Ghere and McLelland were apprehended in Englewood, New Jersey. At the time of their arrest they each made a signed statement of questions and answers. In these statements and in conversation on the way returning to Chicago, Ghere and McLelland told their story implicating plaintiff in error. Both testified admitting the robbery and implicating plaintiff in error. Their signed statement was not offered in evidence. Nowicki took the stand and denied having had anything to do with the planning of the robbery.

His conviction rests almost entirely on the testimony of the two accomplices. The only testimony offered on behalf of the defense as to the transaction was that of Nowicki denying any participation therein and the testimony of one Wagner, who stated that he met Nowicki at Niles Center, a few miles out of Chicago, on the afternoon of September 2 for the purpose of viewing some property which the latter owned there. The robbery occurred on that morning about nine o'clock.

Counsel for plaintiff in error contends that an analysis of the testimony of Ghere and McLelland, together with the fact that they are by their own confession the robbers who committed the offense, will demonstrate that they are unworthy of belief, and that therefore the jury were not justified in returning a verdict of guilty against plaintiff in error. It is not complained that the verdict was the result of passion or prejudice on the part of the jurors or prejudicial remarks of the court or counsel. No errors are assigned on the rulings of the court on the admissibility of testimony. It is admitted by counsel for plaintiff in error that a conviction may be had on the uncorroborated testimony of accomplices, but it is stated that such testimony is subject to close scrutiny, and the argument is that in this case, when the evidence is analyzed under this rule, there is a reasonable doubt of the guilt of plaintiff in error and the jury were not justified in finding him guilty.

Ghere testified that he met Nowicki during July, 1926; that he was well acquainted with him and saw him once a week during the summer of that year, mostly in a bookmaker's office where arrangements were made for betting on horse races; that he was sometimes at his home on Elmdale avenue, in the city of Chicago; that he had talked with him at the Morrison Hotel, the Palmer House, the Dearborn Coffee Shop, and at street corners and by telephone; that McLelland had engaged a room on the sixteenth floor of the Palmer House during the latter part of August, and

that Nowicki visited this room a few days before the robbery while witness was present; that McLelland had called Nowicki by telephone, and that the latter on the occasion of that visit complained of his doing so, saying that it was foolish to call him from the hotel; that Nowicki then stated that he had a job for witness and McLelland; that he wanted them to move to the eleventh floor; that at that time witness was not registered, although McLelland was registered under the name of Andre Lapue; that Nowicki told them that a jewelry salesman was going to stop at the hotel, or was stopping there, on the eleventh floor; that after this conversation witness registered at the hotel and secured a room on the eleventh floor under the name of Flynn; that he did not remember the room number; that in accordance with Nowicki's suggestion McLelland checked out from the sixteenth floor and he and witness went outside the hotel, the latter returning with McLelland's grip to witness' room; that about a half hour later McLelland came up again; that later witness met Nowicki at the Morrison Hotel, and the latter told him that the salesman he referred to had four packages of diamonds worth $250,000 or $300,000; that he described the salesman and told witness of his practice of coming down each morning to get his diamonds and returning to his room before going out; that sometimes he called on a girl on the South side in the evenings; that after his day's business he would put his brief case back into the office safe; that Nowicki said that he would meet witness in the lobby of the Palmer House the next morning and point out the salesman to him; that this was three days before the robbery; that the next morning he saw Nowicki in the hotel lobby but did not have any conversation with him; that Nowicki had told him he would give a signal by raising his hat when the salesman came by and that witness was to follow him outside; that when Kadison came by Nowicki raised his hat, got up and followed Kadison out at the Monroe street entrance; that wit-

ness followed Nowicki, who told him that this was the man and to follow him; that McLelland was present and followed about ten feet behind witness; that he and McLelland followed Kadison down State street; that McLelland was on the west side of State street and witness on the east side; that it was raining, and Kadison went as far as Madison street and then came back toward the hotel, stopping at a drug store, and McLelland stopped in the drug store also, and he and witness later followed Kadison out and back to the hotel; that they saw Kadison check his brief case and go up to his room; that later that day or the next Nowicki told witness to get another room close to Kadison; that the room he had was opposite and farther down the hall, and witness hired a man by the name of Newman to register for him in the room next to that of Kadison; that Nowicki told witness that he or a friend of his would notify witness and McLelland by the house telephone when Kadison took his brief case from the office and started to his room, by saying, "Customer coming up;" that on the morning of the robbery he went to the hotel about six o'clock, had breakfast in the basement and then went up to the room which Newman had registered for him, which was then occupied by McLelland; that he slept at home and did not sleep in the hotel; that a short time after he had gone to the room next to that of Kadison the telephone rang and McLelland answered; that witness took a gun and a cane and went out into the hall; that he took the cane to simulate lameness, so that he could walk down the hall slowly; that as Kadison came to his door and inserted the key to unlock it, witness seized him and threw him into the room then occupied by McLelland and drew a gun and told him to keep still; that they bound him and took his property, including the brief case containing the diamonds; that witness left immediately and took the elevator to the lobby floor, and going outside hailed a taxicab at the corner of Wabash avenue and went to his garage,

where he waited until McLelland arrived; that when Mc-Lelland came in they opened the brief case and found two black wallets in the pocket of a patent vest; that they took out four stones of a half or one carat each, burned the brief case and the wallets, and put the diamonds, enclosed in small tissue paper envelopes, together with the papers in the brief case, into a shopping bag; that McLelland left, saying that he was going to a show, and witness stayed around home; that he telephoned Nowicki, but he was not in, but toward evening he received a call from him; that by previous arrangement with Nowicki the latter was to use the word "Otto," to which witness was to respond by the use of the same word; that this was done and Nowicki told him to meet him on his property where they had met before; that in reply to this statement he used the word "Otto;" that he went to Nowicki's property, in Niles Center, which consisted of vacant lots, and there gave the diamonds to him, who was to dispose of them because he knew some firms dealing in diamonds.

McLelland's testimony as to the robbery corroborates that of Ghere with the exception of minor details. He stated that he had known Nowicki for a period of about two years and had seen him quite often; that he had taken a room at the Palmer House under the name of Andre Lapue and was assigned to room 1617; that his purpose in moving there was to sell whiskey; that on August 28, or about that date, he saw Nowicki in his room and that Ghere was there; that Nowicki was peeved because witness had telephoned to his home and said that it was foolish for him to do so; that Nowicki told them he had a job for them to pull; that a jewelry salesman was going to stop, or was stopping, at the hotel who had about a half-million dollars' worth of jewelry. He also corroborates Ghere as to changing his room to the eleventh floor and the manner in which that was done. He also detailed the manner in which he said Nowicki was to identify the complaining witness, and the oc-

currence on that day when he and Ghere followed the complaining witness in his trip out from the hotel and back; that he received a telephone call on the morning of the second, saying that a customer was coming up; that he was not sure that it was Nowicki's voice; that he spoke to Ghere, who left the room and took a gun with him. The details of the robbery were described by this witness as given by Ghere.

Ghere testified further that when he met Nowicki at Niles Center and turned the diamonds over to him he told him that he ought to have $100,000 out of it; that Nowicki said that was impossible but he would do the best he could; that the next day he again met Nowicki at the Niles Center property, and the latter gave him $1000 and told him that things wouldn't turn out as well as he had expected and witness couldn't expect to get $100,000; that witness told him to return the diamonds to him, which he refused to do, saying that witness should leave it to him; that Nowicki thereupon agreed to get him $80,000; that some days after this he made another appointment with Nowicki and met him at his property in Niles Center; that Nowicki then gave him $3000 but told him he would not be able to give him a total of more than $60,000; that witness was not satisfied and wanted him to give the diamonds back, and that Nowicki told him he would have to return the money that he had given him; that he was older and witness should leave things to him, and finally witness agreed to accept $60,000; that another appointment was made to meet Nowicki at the same place on a later day, about a week after the time he gave witness the $3000; that he went out alone to Niles Center; that Nowicki was not there, but there were three men there who claimed they were plain-clothes men and told him that he was under arrest and they were going to take him to the detective bureau; that they were waiting for someone else to arrive and asked him where his partner was; that they poked a gun in his ribs but didn't

take him to the bureau; that they took him down the road a way and told him they would let him go for $50,000, to which he replied that he hadn't seen $50,000; that they then said they would accept what money he had, and he took them over to a bank on Wilson avenue and gave $2000 to the leader; that these men said two of them were Mike Grady and Phil Carroll; that since that time he had seen Grady and Carroll and that they were not the men who met him at Niles Center; that after this experience he telephoned to Nowicki and succeeded in reaching him later in the day and made an appointment to meet him at the Edgewater Beach Hotel but did not tell him over the telephone what had happened at Niles Center; that on the following day he and McLelland went to the Edgewater Beach Hotel and Nowicki was there; that he accused Nowicki of being responsible for the parties holding him up at Niles Center, but that Nowicki denied it and said that some of witness' friends had tipped off the meeting place; that witness had told no one but Nowicki about the meeting; that Nowicki gave him and McLelland $2000 at the Edgewater Beach Hotel and suggested a meeting place at Niles Center again, to which witness would not agree, but that it was agreed that he would go to the office of a lawyer and call for a package at a certain hour; that he went to the office at that time and said that he was the man that Nowicki sent down, and asked if there was a package for him; that the lawyer gave him the package; that later he opened the package and found it contained $4000; that he didn't talk to Nowicki after that and didn't hear from him again and got no more money from him. No one other than Nowicki denied the delivery of the package.

McLelland testified concerning the happenings after the robbery, that he saw Nowicki some time after that occurrence and that he had received one-half of the money which Ghere got from Nowicki; that he was present at the meeting at the Edgewater Beach Hotel and that Nowicki had

tried to cut their part of the dividends on the transaction; that there was an argument about their being held up, and they accused Nowicki of sending his friends to take money away from them which he had given. Both Ghere and Mc-Lelland also testified to having been held up on another occasion, a short time after the robbery, in a store identified in the record as Hill's store, where they had gone to get some clothing; that while they were there three men came in who claimed to be officers and said they were under arrest and took them in a car to an apartment on the North side. Ghere testified that he thought it was on Elmdale avenue near Nowicki's residence, and McLelland testified that he thought it was on Foster street; that there was a woman there who these men claimed was the floor woman at the Palmer House; that they knew she was not, because the floor woman at the Palmer House was a red-headed woman; that they searched McLelland and got $4200 from him and got about $100 from Ghere and demanded the diamonds; that Ghere went with one of the men and got some diamonds. McLelland testified that he did not know where they went and Ghere did not testify as to where they got the diamonds; that they were brought back to this apartment and counted; that there were thirteen of them; that the men who claimed to be detectives said that there was a $12,000 reward and they did not think the diamonds were worth that much money and insisted on more money; that one of them asked McLelland if he knew Nowicki, and when he said he didn't the man laughed and said he had a lot of nice friends. Neither of these witnesses identified any police officers as being the men who took them away from the Hill store. They testified that they were taken to the apartment in a Peerless automobile. The record shows that the police department of the city of Chicago did not own a Peerless automobile. These witnesses testified further to having been in Indianapolis and Cleveland after this

robbery, and later in Englewood, New Jersey, where they were arrested.

The registry cards of the Palmer House were introduced in evidence and corroborate these witnesses as to the dates of their registry and change of rooms; they also showed telephone calls on August 25, 26 and 28 from the room occupied by McLelland as Andre Lapue, though the evidence does not show whether the hotel kept a record of the numbers called. Other testimony was offered corroborating the statement of Ghere and McLelland as to their whereabouts following the robbery.

Plaintiff in error denied all connection with Ghere and McLelland and testified that he knew them but slightly; that Ghere had been out at Niles Center at one time to look at his property, saying that he might get someone interested in the purchase of it, and that he had seen Ghere and McLelland around the book-maker's office. Counsel for plaintiff in error contends that the evidence shows ill-will on the part of Ghere and McLelland against Nowicki, and that this shows their motive for putting the blame on him. The evidence referred to concerned the giving of a check by Ghere to the book-maker which was returned marked "Insufficient funds." Plaintiff in error had told Ghere that the check had been returned and that they were looking for him, and that Nowicki later paid the check. We are not impressed that such circumstance constitutes evidence of ill-will on the part of Ghere and McLelland toward Nowicki. His paying the check and warning Ghere of its return uncanceled and that they were looking for him would tend to indicate a friendliness rather than ill-will existing between them. If the statements of Ghere and McLelland are true, ample evidence of motive is shown by their testimony. If, as they testify, Nowicki, after planning the robbery, had refused to divide evenly with them, the motive for their confession as to the transaction implicating him would seem clear. The evidence upon which plaintiff in error was con-

victed was that of accomplices and should be scrutinized closely. A careful analysis of the testimony of Ghere and McLelland as to their various acts and their whereabouts during the time of the robbery and just before and afterward discloses corroboration in all particulars except minor details, in which witnesses telling the truth might well differ. If, as contended by plaintiff in error, this was a gratuitous attempt to implicate an innocent man, such, in itself, would constitute an atrocious crime. The evidence does not disclose that Nowicki had ever previously been arrested. He stated that at the time of the robbery he was a betting commissioner for a horse owner and was frequently in the "bookie's" office. He testified that during the years 1917 and 1918 he had worked as a waiter in hotels, cafes and restaurants; that he came to Chicago in 1919 and sold bonds for the Trans-Atlantic Association for nine or ten months; that he was for five or six months in charge of one of the serving rooms in the Morrison Hotel; that from January to August, 1924, he was selling property in Niles Center; that thereafter he worked for a couple of months in a ladies' ready-to-wear shop; that during 1925 he did not have much of a position but was connected with racing stables as betting commissioner; that after the racing season closed he worked for the Elias Levy Company, an importer of novelties; that the firm dealt in the stocks which jewelers usually carry; that Elias was one man and Levy was another; that Levy's name was Ernest and that he was a brother of Max Levy, a diamond broker, who had offices in the same building with the Elias Levy Company; that he would handle property of the Elias Levy Company on memoranda; that later on he also handled diamonds on memoranda for Newman, on Clark street.

It is the province of the jury to pass upon disputed questions of fact, and this court will not overturn their verdict unless it is clearly apparent that the decision was the result of passion or prejudice or unless it clearly appears

from the record that there is a reasonable doubt of defendant's guilt. *People* v. *Martin*, 304 Ill. 494; *People* v. *Fisher*, 303 id. 594; *People* v. *Cunningham*, 300 id. 376; *People* v. *Maciejewski*, 294 id. 390.

Plaintiff in error also complains of an instruction given on behalf of the People defining "an accessory." This instruction was given in the wording of the statute, but plaintiff in error complains that the instruction did not caution the jury that the court did not intend to indicate that the defendant was an accessory but that that issue was one for the jury to determine from the evidence. This instruction has been approved in numerous cases and is not open to the objection urged. (*People* v. *Everett*, 242 Ill. 628; *People* v. *Lee*, 237 id. 272.) The jury were fully instructed that they must believe the defendant guilty beyond a reasonable doubt or acquit him.

It is also complained that numerous instructions were given on the matter of reasonable doubt. The court gave three instructions on reasonable doubt. While this court has frequently condemned the practice of giving long and involved instructions concerning reasonable doubt, the instructions here given were neither long nor involved. We are of the opinion that the giving of these instructions was not reversible error.

The jury heard the witnesses. There is no complaint of an appeal to passion and prejudice on the part of counsel for the State or error in the rulings of the court on admission of evidence. The record is free from error on the trial. While the testimony on which plaintiff in error was convicted was that of accomplices who participated in the actual commission of the crime, we are unable to say that the jury, who saw and heard the witnesses, were not justified in believing their testimony.

The judgment of the criminal court will therefore be affirmed.

*Judgment affirmed.*