(No. 19475.

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* EDWARD CUMMINGS *et al.* Plaintiffs in Error.

*Opinion filed February 21, 1930—Rehearing denied April 3, 1930.*

James McDermott, Benedict J. Short, and Wm. Scott Stewart, for plaintiffs in error.

Oscar E. Carlstrom, Attorney General, John A. Swanson, State's Attorney, and James B. Searcy, (Edward E. Wilson, and John Holman, of counsel,) for the People.

Mr. Commissioner Partlow reported this opinion:

Edward Cummings, Rocco Rotuno, Arthur Schaeffer and Meyer Goland were tried in the criminal court of Cook county under an indictment which charged them with robbery with a gun at the Parody Cafe, at No. 1021 North State street, in Chicago, on the morning of December 5, 1927, between two and three o'clock. Goland was found not guilty and the other three were found guilty. They were sentenced to the penitentiary, and a writ of error has been prosecuted from this court to review the judgment.

It is insisted that the evidence does not sustain the judgment. The evidence shows that the cafe was owned by Dave Palnitski. It was on the second floor of the building and was reached by a stairway in the front of the building which led from the street to the second story. In the front, on the second floor, was a reception room, and off of the reception room was a check room, wash room and toilets. Back of the reception room was a dining room, containing a dance floor in the center, a platform for an orchestra and performers, together with tables, chairs and settees. There were 250 or 300 people in attendance. Among those present were several police officers, including George Schert, who was a Lincoln Park policeman, and Leslie Larsen, James J. Sweeney, Charles Cohan, John I. Fried and Herman R. Dorf, who were city police officers. About three o'clock several armed men made their appearance in the dining room through the reception room. How many there were does not definitely appear from the evidence. There were at least three and probably several more. Each one had on an overcoat and a hat or cap and a handkerchief over the lower part of his face. One man went down the center aisle towards the dance floor, and he had in his hand a sawed-off shot-gun. The other two went down the outside aisles, and each was armed with a revolver. When the man with the shot-gun got to the dance floor, the evidence shows that Goland, who was sitting at the southeast corner of the dance floor, went over to this man, pointed to the southeast corner of the cafe, where the proprietor was sitting, and shouted several times, "There he is! There he is!" Someone announced that it was a hold-up and shooting began immediately, the shots apparently coming mostly from the police officers present. The three hold-up men started to make their exit and the police officers arrested Cummings and Goland. All three of the plaintiffs in error immediately after this affair were found to have been wounded, some of them several times. Cum-

mings had a wound in the abdomen, one in the right shoulder, one on the fourth finger of the right hand, one in the left hip, and there was an injury to the thumb on the left hand. Schaeffer was shot in the front part of the body close to the sternum on the left side between the second and third ribs. Rotuno was shot in the right side of the chest, near the nipple. Various other persons, including officer Cohan, were wounded, and a waiter was killed.

George Schert testified that he was a Lincoln Park police officer and was off duty on the night in question. He arrived at the cafe about two o'clock A. M. and was in civilian clothes. He sat at the second table on the second row from the north, on the east side. About ten minutes of three o'clock he went to the toilet, which was off ‵of the reception room in the front of the building. While he was in the toilet Rotuno came up to him with a revolver in his hand and ordered him to stick up his hands. Rotuno had on a gray hat and a dark overcoat. The witness put up his hands and went out of the toilet and wash room into the reception room. He testified that in the reception room he saw a colored porter and another civilian; that he saw several parties scuffling, and that someone took out of his hip pocket $65 in money and his revolver. He did not know who it was that took the money. It was not Rotuno but was a man with a gray cap, a dark overcoat and a handkerchief over his face. He testified that one of the men in the reception room had a shot-gun, and he identified Cummings as the man who had the gun. He heard the word "ready" from the outside, and the armed men in the reception room went into the cafe and shortly afterwards the shooting began. Schert got under a table, where he remained until the shooting was over. After the shooting Larsen gave Schert a gun and told him to take Goland and the two girls who were with him into the reception room and guard them. When Schert got into the reception room he found officer Sweeney in charge of Cum-

mings, who was sitting in a chair. Schert testified that he remained until the police arrived and then went to the Henrotin Hospital and then to the Bridewell Hospital. He later corrected this by saying that he first went to the East Chicago avenue police station and then to the hospitals. At the Henrotin Hospital he saw Cummings. He saw Rotuno next morning at the detective bureau and saw Schaeffer at the St. Mary's Hospital. He saw Rotuno two days later at the East Chicago avenue station. He identified Rotuno at the inquest as one of the men ·who robbed him. He testified that in the reception room, after the shooting, in the presence of Cummings, he said to Sweeney that Cummings was the man who had the shot-gun. He testified that he recognized Cummings as he entered the cafe proper and that he had a shot-gun, and that at the inquest he was not asked to identify Cummings.

Leslie Larsen testified that he was a police officer of the city of Chicago, and that he and his partner, Sweeney, both of whom were off duty and were in citizen's clothes, got to the cafe at 2:15 A. M. in company of two women. They sat on a settee immediately inside of the entrance to the right. He had known Rotuno, Schaeffer and Goland by sight for some time but did not know their names. He never saw Cummings before. About ten minutes of three o'clock he saw three armed men enter the cafe and start down the aisles. Schaeffer went down the west aisle, Rotuno went down the east aisle, and Cummings, who was armed with a shot-gun, went down the center aisle to the dance floor. When Cummings reached the dance floor he yelled, "It's a stick-up!" Goland went over to Cummings, pointed to the southeast corner of the cafe and shouted several times, "There he is! There he is!" and then went back to his seat. The proprietor of the cafe was seated in the southeast corner. He testified that as soon as Cummings reached the dance floor the firing began, after which Cummings started for the exit, and Larsen fired four times

at him when he was about thirty or forty feet away. Cummings threw down his shot-gun and continued to the exit. Cummings' face was uncovered as he ran to the exit. Sweeney and Larsen followed Cummings out of the door. Sweeney grabbed him at the head of the stairs and Cummings said to them, "Get me a croaker; I have got enough; give me a croaker and I will tell all." After the arrest of Cummings, Larsen arrested Goland and took him and the two women who were with him to the cloak room. Larsen testified that after the shooting began he saw Schaeffer coming up the aisle with a man alongside of him, shooting. He thought the man who was shooting was a waiter, but he later found that he was officer Cohan, who was in full evening dress. He did not recognize Schaeffer when he first entered the cafe because he had a handkerchief over his face, but he had no handkerchief over his face when he went out with Cohan after him and the witness recognized him. After the shooting Larsen went onto the dance floor, announced that he was a police officer, and remained until the police came. Next day he identified Rotuno at the detective bureau and Schaeffer in the Bridewell Hospital. In one of these conversations Schaeffer told him that he was shot at Leavitt and Division streets the night before.

Charles Cohan testified that he was a police officer and had been to a wedding with his wife. He was in evening dress and they stopped at the cafe about 2:45 A. M. He first saw Cummings in the cloak room after the shooting. Cohan was shot in the head twice during the hold-up. He sat at a table just south of the northeast corner of the dance floor. He was in the cafe five or ten minutes before the shooting began. Two shots came from the doorway. A man ran past Cohan with a handkerchief over his mouth. The man had on an overcoat and he crossed the dance floor and ordered everybody to hold up their hands. Cohan stood up. He saw a man with a shot-gun. Cohan pulled his gun and fired three bullets at the man's back.

He testified that this man was Cummings and that he was facing officer Fried when the shot was fired. Cohan did not see Cummings in the face until he saw him later in the cloak room. When he fired the three shots at Cummings there was another man near Cummings with a revolver, and Cohan fired two shots at this man. He testified that he could not identify any of them except Cummings because they were all masked. He testified that after the shooting was over he had a tussle with a man standing in the doorway armed with a revolver, and they rolled down the steps together and Cohan hit him on the head with his gun.

, All of the plaintiffs in error took the stand and denied their guilt. Cummings testified that he was a patron of the cafe on that evening and that he was sitting at a table with various parties with whom he was drinking, and three witnesses corroborated him in this respect. He testified that he was shot by someone in the place and that he took no part in the hold-up. Rotuno and Schaeffer testified that they left the home of the former about 11:30 that evening. They first went to a restaurant on Chicago avenue known as the Italian Village, where they remained until shortly after two o'clock. They were corroborated by the proprietor, a waiter, a cab driver and several patrons. They testified that they then started home, and when they reached the vicinity of Rotuno's house, about 2:30, they were fired upon by some unknown assailant who drove up in a car and after the shooting sped away. Two neighbors and two relatives of Rotuno testified that they heard the shots. Rotuno told the police officers that he was alone when he was shot but upon the trial he testified that Schaeffer was with him. Schaeffer testified that after the shots were fired he did not stop at Rotuno's house but ran to the hospital; that he hailed a passing automobile and went to the front door of the St. Mary's Hospital and was admitted. He did not know the driver of the car, because the driver

said he did not want to get mixed up in the affair. He was admitted to the hospital about 2:30 A. M. Immediately upon entering the hospital the police were notified, and they went to the hospital while his wound was being dressed. About four o'clock another squad of police called. The doctor who attended Schaeffer and one of the Sisters testified that he was at the hospital about 2:45 A. M.

Irving Lambert, upon the request of plaintiffs in error, was called as a witness by the court. He testified that he and another lad were in the wash room and someone came in with a gun and shouted, "Stick them up!" that only one man came into the wash room; that there was nobody on the toilet seats or in that part of the toilet and that nobody came from the toilet while he was there or came through this door with a man behind him; that from the time the hold-up men came in and until after the shooting took place no one came in or went out of the toilet. He testified that he and his friend pushed the man who had the gun out of the toilet and lay down on the floor and put their feet against the door so that it could not be opened; that he was there about two minutes and while he was on the floor he heard shooting; that it lasted a minute or two and he heard screaming and shouting; that the man who came in with a gun was stout and shabbily dressed, and that there was no colored porter in the room at that time. The above constitutes the principal facts in the evidence.

The specific charge in the indictment was that plaintiffs in error, while armed with a gun, robbed Schert. In order to establish this charge it was necessary for the People to prove, beyond a reasonable doubt, that Schert was robbed by plaintiffs in error, or some of them, while they were armed with a gun. If this proof was not made the whole case must fall, regardless of all of the facts in evidence. Plaintiffs in error have made a vigorous assault upon the evidence of Schert. They claim that his evidence does not

establish the *corpus delicti,* and that it is questionable, un-
der the evidence, whether he was even robbed. In support
of this contention the following facts are pointed out:
That Schert testified that he was in the cafe alone, while
another witness testified that a young lady was with him;
that he testified he went to the toilet and was robbed, while
Lambert swore no such robbery took place; that he could
not remember where he first went after the shooting and
did not remember that he first went to the East Chicago
avenue police station; that he could not remember whether
he identified Schaeffer at the St. Mary's Hospital; that he
went to look at Rotuno and Cummings after he had seen
both of them at the cafe; that he made a statement to the
police on December 6 in which he stated that he looked into
two revolvers in the toilet and that the two men who held
him up had handkerchiefs over their faces; that at a for-
mer hearing he testified that the man who held him up
had a mask over his face and a handkerchief in his hand;
and that when asked by the police if he could identify any
of the hold-up men if he saw them again he said that he
did not believe he could.

The record in this case is large. In order to deter-
mine the weight to be given to these alleged conflicting
statements it has been necessary, at considerable labor, to
read the evidence from the record and not depend upon the
abstract filed. We have given these contentions careful
consideration and do not agree with the conclusions drawn
by plaintiffs in error. There are some contradictions in
the evidence of Schert the same as there are contradictions
in the evidence of other witnesses in the case, but these
contradictions are not sufficient to reverse the judgment.
The conclusions drawn by plaintiffs in error ignore entirely
the evidence of Larsen and other witnesses and other facts
in the case. They ignore facts which are not disputed. It
is undisputed that an attempt was made to rob this cafe;
that Schert was in the place when the attempt was made

by several armed men who were masked; that they were distinguished from patrons of the cafe by the fact that they had on hats or caps and coats, while the other patrons had placed their hats, caps and wraps in the cloak room. The hold-up men came up the stairway from the street and entered the reception hall. Off of the reception hall was the toilet. Schert testified that when he came out of the toilet into the reception room there were several armed men there. Lambert testified he only saw one armed man at the door of the toilet and that he and another lad prevented the robber from entering the wash room. It is apparent that before the hold-up men went into the cafe proper there were several armed men in the reception hall and that they were there about the time Schert came out of the toilet. Which of these witnesses should be believed was for the jury to determine. The jury believed Schert when he said that he was robbed. When his evidence is taken in connection with the evidence of Larsen and others we cannot say that the jury were not justified in believing that Schert was robbed. The other apparent contradictions in the evidence of Schert fall within the same rule.

Plaintiffs in error claim that Larsen made contradictory statements as to the positions of the various plaintiffs in error and what they did, and that his opportunity to identify plaintiffs in error was very uncertain and unsatisfactory. The evidence of this witness is not capable of the interpretation sought to be placed upon it. Larsen testified positively that he knew Goland, Rotuno and Schaeffer and had known them for some time. He identified all of them positively. He was not acquainted with Cummings, but he identified him on the dance floor and as he started for the exit. He helped arrest Cummings at the head of the stairs and put him under guard in the reception room. It is apparent that there was a great deal of excitement and confusion during this raid. Shots were fired, people were excited, women were screaming and there was much con-

fusion. It is not strange that all persons present did not see things alike. It would be strange if they did, but notwithstanding these facts the evidence was sufficient to sustain the judgment.

Plaintiffs in error insist that the robbery of Schert was a crime complete in itself, and when the People proved that crime they should not have been permitted to prove what later took place in the cafe when the shooting occurred. The rule which excludes on the trial of one charged with a criminal offense evidence of his commission of other crimes than that with which he is charged applies only to disconnected crimes, and if evidence offered has a tendency to prove the crime charged it is competent even though it also proves a separate, distinct offense, and the fact that a full investigation of the facts involved in the commission of the crime discloses the defendant's guilt of other crimes does not limit the scope of the investigation. (*People* v. *Pargone*, 327 Ill. 463.) If the evidence of other crimes tends to identify the accused or to locate him at the scene of the crime when an alibi is set up, or is necessary to prove motive or guilty knowledge, evidence of the other crime is admissible. (*People* v. *Heffernan*, 312 Ill. 66.) The evidence in this case shows an attempt to rob this cafe, and any and all persons in it who had valuables, regardless of where they were. The robbery began in the reception room, wash room and toilet and then extended into the cafe proper. The evidence shows that Cummings and Rotuno were armed in the reception room and that the three plaintiffs in error came into the cafe. The robbery was one complete and entire transaction. It could not be divided into one or more single or separate robberies or one or more single or separate crimes. The evidence complained of was proper to identify the accused, to locate them at the scene of the crime, and it was properly admitted.

The State's attorney served plaintiffs in error with a list of about thirty witnesses. After using four of these

witnesses the People rested their case. Plaintiffs in error insist that they were taken by surprise by this action and most of these witnesses had left the court room and they had no chance to use them, and that if they had been given the opportunity to use them these witnesses would have contradicted some of the evidence offered on behalf of the People. The question of the duty of the State's attorney to use all of the witnesses has been before this court on several occasions, and it has been held that if the State's attorney doubts the veracity or integrity of a witness whose name is endorsed upon the indictment he is not obliged to call him but the court may call the witness and leave him open to cross-examination by either side. (*People* v. *Barrett,* 261 Ill. 232; *People* v. *Rardin,* 255 id. 9; *People* v. *Cleminson,* 250 id. 135; *Carle* v. *People,* 200 id. 494; *Bressler* v. *People,* 117 id. 422.) The court offered to permit plaintiffs in error to subpœna these witnesses if they saw fit, but they did not take advantage of the offer. The court at the request of plaintiffs in error called two or three of these witnesses, and they testified and were cross-examined. The claim that if all of these witnesses had been called some of them would have contradicted some of the evidence offered by the People is mere conjecture and is not sustained by the record. Plaintiffs in error had the opportunity to call these witnesses and prove these contradictions, but they did not do so.

Plaintiffs in error insist that the State's attorney, over their objection, improperly got before the jury the fact that officer Fried identified Rotuno at the police station. In his direct examination Rotuno testified that he was taken to the East Chicago avenue station, where a number of people looked at him. He had to walk up and down in front of these people and put a handkerchief over his face. He was asked on the trial whether any other officers identified him, and he said no. The officers were asked to stand up, and the witness said he had never seen them and did

not know whether he had seen them at the East Chicago station or not. Rotuno testified on direct examination what was said and done on this occasion, and on cross-examination the People had a right to ask him as to anything said or done to which he did not testify in chief.

Plaintiffs in error object to the testimony of Fannie Hillman, who was called as a witness by the court at the request of plaintiffs in error. It appeared from her cross-examination that she was shot in the hand with a shot-gun, and she exhibited her hand to the jury. The fact that she was shot with a shot-gun corroborated other testimony in the case that one of the held-up men had a shot-gun on the dance floor. There was no error in the admission of this evidence.

Complaint is made that the State's attorney in his argument to the jury called plaintiffs in error hoodlums and hold-up men. In *People* v. *Spaulding,* 309 Ill. 292, it was held that in a murder trial it is not improper for counsel for the People to denounce the defendant as a thief and a gunman where such statements were based upon evidence in the record from which such facts might be legitimately inferred. There was evidence which justified this reference and there was no error in the remark of the State's attorney.

It is objected that in the argument the State's attorney told the jury that they had often seen criticism in the public print of unscrupulous and shyster lawyers who got criminals free and onto the street; that that was the way they got their money; that never on God's earth would he be on the other side, and that he could not stultify himself and could not prostitute his profession that way. No objection was made to these remarks except that one of the attorneys made a protest, saying that he occasionally defended a criminal case. The court took this remark as an objection to the argument and sustained it as an objection. The State's attorney stated that he only made the remarks

in answer to remarks which had been made by one of the attorneys for plaintiffs in error. The court correctly and properly instructed the jury with reference to statements of counsel which were not sustained by the evidence and that they should arrive at their verdict solely from the evidence in the case. The entire argument does not appear in the record, and it is impossible to tell whether the remarks made were in answer to remarks made by counsel on the other side. The court sustained the objection, which in this instance was sufficient.

Complaint is made of the second, fifth, sixth, tenth, thirteenth and fifteenth instructions on behalf of the People. The second instruction defined an alibi. An instruction in the identical language of this instruction was approved by this court in *People* v. *Sheets,* 333 Ill. 624, *People* v. *Thompson,* 321 id. 594, and *People* v. *Schladweiler,* 315 id. 553. The instruction not only announced a correct rule of law but under the evidence it was properly given. The sixth instruction was also on the question of an alibi, and the rule announced was approved by this court in *People* v. *Robinson,* 308 Ill. 398. The fifth instruction defined an accessory before the fact. It is not claimed that the instruction did not state a correct rule of law but it is insisted that there is no evidence that any plaintiff in error was an accessory, and that the instruction might be considered as assuming that a crime had been committed. The specific charge in this indictment was that Schert was robbed. Whoever robbed Schert did so pursuant to a plan of robbery. Those who did not actually rob him were accessories before the fact because they aided and abetted in the robbery, therefore there was evidence on which to base the instruction, and it did not assume that a crime had been committed. The tenth instruction defined circumstantial evidence, and it is insisted that it was improperly given because there was no circumstantial evidence in the case. The evidence showed that Cohan fired at Schaeffer with a 32-caliber re-

volver, and a 32-caliber bullet was found in Schaeffer's coat at the hospital. The facts that men came into the cafe masked and shouted, "Hands up!" were circumstances showing that a robbery was about to be committed. Shot found in the hand of Fannie Hillman was a circumstance tending to show that a shot-gun was used by someone, and there was evidence that Cummings had a shot-gun. There were other facts proven by circumstantial evidence sufficient to form a basis for the giving of this instruction. The thirteenth instruction told the jury that the intent to rob must be proven; that it was not necessary to prove the intent by direct or positive evidence but it might be proven by facts and circumstances in evidence. The objection to this instruction is that it is an abstract proposition of law. Even if it was an abstract proposition of law and might properly have been refused, it did not injure plaintiffs in error and did not constitute reversible error. (*People* v. *Kozel,* 303 Ill. 112.) The fifteenth instruction stated the rule relative to the weight to be given to the testimony of plaintiffs in error. This instruction was approved in *People* v. *Maciejewski,* 294 Ill. 390. It was criticised in a later case, but the giving of it in this case did not constitute reversible error.

When the evidence is considered as a whole it established the guilt of plaintiffs in error beyond a reasonable doubt and the jury were justified in so finding. There were no errors on the trial which would justify a reversal of the judgment, and it is affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Partlow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Judgment affirmed.*