(No. 22712.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MATTHEW KUKULSKI, Plaintiff in Error.

*Opinion filed December 19, 1934.*

CHARLES A. BELLOWS, for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, and HENRY E. SEYFARTH, of counsel,) for the People.

Mr. JUSTICE ORR delivered the opinion of the court:

This is a writ of error to the criminal court of Cook county to review a judgment of that court entered on the verdict of a jury finding plaintiff in error, Matthew Kukulski, guilty of robbery while armed with a dangerous weapon. The first count of the indictment charges that Kukulski, Eddie Gora and John Ross on December 23, 1933, while armed with a pistol, robbed Jeanette Liebner of $40. The second count is similar to the first, but omits the charge that the robbery was committed with the use of a dangerous weapon.

Mrs. Jeanette Liebner conducts a beauty parlor at 1758 West Garfield boulevard, in the city of Chicago. The evidence for the People is that shortly after midnight of December 23, 1933, Mrs. Liebner, three customers and an employee were in the beauty parlor when two boys, both armed with revolvers, entered. The plaintiff in error (whom we will refer to as Matthew) was the first inside, announced that it was a "stick-up," and demanded money. When he was informed that money was not kept in the shop he walked around inside, opened the drawers of a dresser and a cabinet, and in his search found three purses, one containing $40 and one containing $55. He took the purses and money away with him. On March 4, 1934, police officers arrested him and another man and took them to the beauty parlor at about 7:00 o'clock the same morning. Mrs. Liebner and one of the women with her on the night of the robbery then identified Matthew. Three different witnesses testified that when he was asked if he knew Mrs. Liebner, he replied that she did not have her "Sunday face on," and also remarked that all those present in the beauty parlor were blonds, although Mrs. Liebner testified that one was a brunette. The prosecuting witness and the customer mentioned identified Matthew at the bureau of identification in Chicago on the same afternoon of his arrest in a group of nine persons. Both of them asked him

what he did with their pocket-books, and he replied that he threw them away. Both of these witnesses testified that Matthew wore a cap and a lumber jacket with a zipper front. One of them said that he had heavy eye-brows, and that she had told a police officer on December 24 that he was tall, thin-faced and of dark complexion. The other boy wore a short coat and a cap.

Two police officers testified that Matthew was at a chili parlor at Fifty-first street and Racine avenue in the early morning of March 4, 1934. A man whose name was not known to the officers gave them the information that Matthew had committed the robbery of the beauty parlor. One of the officers got out of the automobile in which they were riding, and as he approached Matthew, and a man with him, the two ran down a muddy alley. One of the officers pursued them and the other officer ran down Racine avenue in an attempt to intercept them. They ran into a gangway and disappeared. One of the officers recognized Matthew, and the two officers went to his home about 6:00 o'clock that same morning. Matthew's mother said that her son was not at home. The officers, however, were admitted to the house and found two boys in one bed and a third boy in a second bed. The officers asked the boys where Matthew was, and they said that he was not at home—that he had not been home all night. The officers entered a bed-room off the kitchen and there saw a girl in bed. She said that she and her mother slept there. The officers found Matthew under the bed with his clothing on, wet and covered with mud from his shoes to his knees. He was taken to the police station and questioned in the presence of Eddie Gora and John Ross. All three then admitted their guilt. Matthew said that Ross supplied the automobile in which they rode, Gora provided a revolver, and that he (Matthew) designated the place to be robbed.

The police officers drove with Matthew and Ross along Garfield boulevard, and when they reached the block in

which the beauty parlor was located Matthew was asked if he recognized the place. One of the officers indicated the street number, 1758, and asked if that was it. Matthew said that it was. Mrs. Liebner came to the door. Matthew and Ross were brought into her presence and she identified Matthew. It was then that the conversation occurred in which Matthew remarked that the prosecuting witness did not have her Sunday face on and that the five women there were all blonds. Matthew was twenty years of age at the time of the trial.

In behalf of the defense, Matthew, his brother and a married sister testified that on the night of the robbery he was confined at home with a swollen jaw which his mother and sister were treating with hot applications. The married sister remained until between 12:30 and 1:00 o'clock that night. In support of the testimony that Matthew had an affected jaw a dentist testified and produced his record book of daily appointments. The book contained partially blank pages with printing showing the working days of the week, three on each page. Each hour of the day (except 12:00 o'clock noon) for each working day was printed, with two lines for appointments from 9:00 o'clock A. M. to 9:00 o'clock P. M. In the dentist's handwriting on one of the lines for appointments for 10:00 o'clock A. M., Thursday, December 21, was an entry of the name "Kukulski," after which appeared a notation in lead pencil, "10:45." On December 23, on one of the lines for 2:00 o'clock appointments, the same name appeared, followed immediately by the figure "2" and at the end of that line the figure "1." The dentist testified that he made notations in that manner to indicate the payment in dollars of the amount shown by the figures. The same name appeared on the appointment line for 2:00 o'clock on December 30 with a figure "2," followed either by cross-marks similar to "X" or the figure "1," with a line drawn obliquely through it. A check mark appeared opposite the names of many per-

sons in the book but not opposite all of them, and there is none opposite Matthew's name. The dentist testified that these check marks indicate that the patient whose name appeared on that line had called at the office. After looking at his book the dentist testified that he remembered that Matthew was in his office notwithstanding there was no check mark opposite his name. The witness was unable to explain why the check mark was omitted from Matthew's name on December 23. He was also unable to explain an error of one dollar in the addition of the amounts received from December 18 to and including December 23, as shown by his record. In the same handwriting as that in which other totals are shown in the book "128" appears, whereas that is not the correct total of the daily amounts paid for the week December 18 to 23, inclusive, which includes the amount of one dollar testified to have been paid by Matthew. The dentist testified that Matthew had a swollen jaw, and that on both of his visits on December 21 and 23 he directed him to apply the hot applications; that he had an ankylosis, and his neck and glands were also swollen. Matthew returned to the dentist's office after the new year and stated that the doctor had lanced his jaw.

A complete denial of participation in the robbery of the beauty parlor was made by Matthew at the trial. He denied being at the restaurant at Fifty-first street and Racine avenue, denied admitting to the police officers that he was one of the men who committed the robbery, and stated that the first time he knew that the beauty parlor had been robbed was when he was taken there by the police officers. He denied that either Mrs. Liebner or her customer asked him about her pocket-book, and he told Mrs. Liebner she was mistaken in accusing him of committing the crime for he was at home with lockjaw on the date she mentioned. He testified that he retired on March 3 between 10:00 and 10:30 o'clock and was in his own bed when the police officers came to his home the following

morning; that he had on an undershirt when they came but not trousers and shoes, and that the articles of clothing mentioned were not muddy. On rebuttal, Mrs. Liebner testified that the man who pointed a revolver at her on the night of the robbery did not have a swollen jaw or swollen neck.

It is contended that the court erred in not compelling the prosecution to call all the eye-witnesses to the commission of the crime; that the court committed error in improperly restricting the cross-examination of the People's witnesses; that evidence for the defense was improperly restricted; that there was prejudicial conduct by the State's attorney and the court, and that the evidence did not prove Matthew guilty beyond a reasonable doubt.

The State's attorney is not obliged to call witnesses even though their names are endorsed upon the indictment. He may doubt their veracity, or for some other reason may not wish to call as witnesses those who were present when the crime was committed. It was the privilege of the defense to call any such witnesses they desired. *People v. Cummings,* 338 Ill. 636; *People v. Barrett,* 261 id. 232; *Carle v. People,* 200 id. 494.

The cross-examination of one of the People's witnesses which it is argued was unduly restrictive was that of Mrs. Liebner. One of the questions asked was: "The only description you gave was that he [Matthew] had heavy eyebrows; is that right?" An objection was properly sustained to the question, for that was not the only description of Matthew which the witness had given. A question was asked, "Did you talk to anyone that made an investigation of the alleged hold-up on the 23d day of December, 1933?" At the time the question was asked it was not shown that the witness knew that any such investigation had been made. She later testified on behalf of the defense that she talked with four police officers who visited her place on December 24, 1933, and told them that Matthew

wore a dark suit, lumber jacket with a zipper front, gray cap and dark trousers, was tall, had a thin face and was of dark complexion, and did not remember saying that he had a dark beard. Objections to other questions on cross-examination were sustained because they threw no light upon the question of whether Matthew was guilty of the robbery, but no undue restrictions were imposed by the trial court to the asking of proper questions on cross-examination.

The next contention is that the trial court improperly restricted the evidence for the defense. Illustrating the character of the testimony offered to which objections were sustained are the following substantive .questions: Dr. Knitter was asked the size of Matthew's jaw when it was swollen, and he answered that it was about twice the size of the normal jaw. Even though the doctor might have given an opinion from his observation of Matthew at the time, he had not previously seen him and was therefore not familiar with his facial features. Dr. Knitter was shown his appointment book and was asked certain questions about the entries, to which objections were sustained. The court stated that he could not testify from the book but could only use it to refresh his recollection. The ruling was correct. (5 Jones' Commentaries on Evidence, (2d ed.) sec. 2378.) Matthew's brother was asked whether he knew the former had an operation, and he replied that he did. He was next asked, "When?" and to that question he made an unresponsive answer, which was stricken. The question was repeated and an objection to it was sustained. Another witness was asked the condition of Matthew's jaw. An objection to the question was sustained. On the cross-examination of one of the police officers he was asked whether of his own knowledge he knew what report was made of the description of the man who committed the robbery. An objection was sustained after the witness had answered that he could not remember. We cannot perceive how Matthew was prejudiced by any of the rulings of

the court upon any of these questions. The testimony of Matthew, his brother, his sister and the dentist was that he had a swollen jaw on December 23. Three of these witnesses testified that he was confined at home at the time of the robbery. All of this testimony was before the jury. The size of the swelling, the date of the operation and the condition of the jaw, even if competent, could not have materially aided the defense.

The conduct of the State's attorney which it is contended was prejudicial occurred during the cross-examination of Dr. Knitter. He was asked if he had been in the office of the State's attorney and had talked with one of his assistants. Upon an objection made, the court stated that the question might be preliminary to laying a foundation for impeachment, and the assistant State's attorney announced that such was the purpose of the question. The court permitted the examination of the witness to proceed. He was asked if he and the assistant State's attorney did not add the figures contained in the part of his appointment record to which reference has been made and if the result of the addition did not show a total of $129. The doctor admitted that such was the fact, and also admitted that the total of the figures as previously written was "128." This total amount covered the receipts for the week of December 18 to 23, inclusive. It is argued that the cross-examination of the doctor gave the jury the impression that he had been under investigation. The record book of the doctor had been impounded by the court. It was not improper for the State's attorney to attempt to ascertain the truth of the charge in the indictment from whatever source was available. He had a right to show an error in the addition of the figures for receipts of the week during which it was testfied that Matthew made his first two calls and the payment of one dollar. The cross-examination was proper.

It is further urged that certain statements made by the court were prejudicial to Matthew. When Dr. Knitter was

on the witness stand he made certain voluntary answers not called for by the questions asked. The court at one time said, "Now, just listen, doctor, and we will get along all right." At other times the court said, "Now, just answer the question." "Now, will you listen, doctor?" "If you will just not answer before the question is asked." These were requests or statements of an admonitory but not hostile character, which were justified by the tendency of the witness to answer more than was required by the question. There was no objection made at the time, and whatever tendency the requests or statements had to diminish the effectiveness of the testimony of the witness resulted from the latter's failure to make responsive answers confined to the questions asked of him.

The final contention is that the evidence does not sustain the verdict. Two witnesses who testified that they were very close to Matthew when he entered the beauty parlor positively identified him as the man who, while armed with a revolver, took the money from Mrs. Liebner. Two police officers testified that Matthew admitted his guilt. The same two witnesses who saw him at the beauty parlor testified that when they saw him after his arrest they asked him what he did with their pocket-books and he said that he threw them away. Three witnesses testified to the same remark made by Matthew about the prosecuting witness not having her "Sunday face on" when he confronted her after his arrest, and that there were five blonds at the beauty shop on the date of the robbery.

Four witnesses testified that Matthew had a swollen jaw on December 23, and three of these witnesses testified that he was at home at the time of the robbery. There is an error in the dentist's record of one dollar in the total of the amounts received for the week covering Matthew's visit to the dentist's office. His name was not checked even though the dentist remembered that he had called. The dentist testified that Matthew made a payment of one dollar

on his second visit, while the latter said the payment was made on the first visit. The testimony is in conflict as to Matthew's condition and where he was found when the police officers called at his home.

The jury saw and heard the witnesses. It is their province to pass upon disputed questions of fact. When we are not able to say, from a consideration of all the evidence, that there is clearly a reasonable and well founded doubt of the guilt of the accused, we are not warranted in interfering with the verdict of the jury on the ground that the evidence does not support it. (*People* v. *Nowicki*, 330 Ill. 381; *People* v. *Davis*, 318 id. 179.) The same rule applies where the defense is an alibi. *People* v. *Mangano*, 356 Ill. 178; *People* v. *Fortino*, 356 id. 415; *People* v. *Martin*, 304 id. 494.

The judgment of the criminal court of Cook county is affirmed.

*Judgment affirmed.*