THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROGER GONZALEZ, Defendant-Appellant.

First District (5th Division)   No. 1—88—0904

Opinion filed November 6, 1992.

Michael J. Pelletier and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Veronica X. Calderon, and Michelle R. Martone, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

Defendant, Roger Gonzalez (Gonzalez), was convicted of murder and attempted murder after a jury trial and was sentenced to 40 years in the Illinois Department of Corrections.

The record reveals that Gonzalez was charged along with Pedro Rodriguez and Orlando Rosa. Gonzalez was charged with one count of murder and one count of attempted murder. The trial court granted motions for severance, and Gonzalez was tried separately from Rosa and Rodriguez. After a jury trial defendant was found guilty of murder and attempted murder. Gonzalez was sentenced to a 40-year term for murder in the Illinois Department of Corrections and to a concurrent 20-year term for attempted murder.

The evidence at trial established the following.

Reni Aguinoza testified that on August 9, 1985, at approximately 9:30 p.m., he was in his backyard with his brother, Jaime Aquinoza, and his friend Isidoro Perez. At the time, Reni had known Isidoro Perez for about two years.

At approximately 12:30 a.m. on August 10, 1985, they were still sitting in the yard when Reni heard "G.D." being yelled from the

south end of the alley. Reni knew that "G.D." meant Spanish Gangster Disciples. The Gangster Disciples are a street gang on the southeast side of Chicago from 87th and Houston Streets. Reni testified that at the same time from the north end of the alley, he heard "Latin Kings" being yelled. He stated that the Latin Kings are a street gang from 89th and Muskegon Streets.

Reni testified that when he heard these two gangs yelling, he believed that something would happen because the Gangster Disciples and the Latin Kings were rival gangs and when they yell their signs it means an altercation is about to occur. Reni saw a group of Latin Kings run towards the south end of the alley. Reni, Jaime, and Isidoro left the backyard and walked down the alley. They saw the gang members turning into a different alley so the three turned around to go back to the yard. They did not see anyone else around.

Reni stopped to urinate while Jaime and Isidoro kept walking back to the yard. At that point, Reni saw three figures jump out of a gangway next to a garage, they yelled "G.D." and started firing. The three figures were about 15 feet from Isidoro and Jaime when they were firing. Reni was about 50 feet from the figures. The three figures were standing in front of Isidoro and Jaime when the shots were fired. As soon as the shots were fired, Isidoro and Jaime turned and started running towards Reni to the south end of the alley. Jaime told Reni that he was hit. Reni said that he did not see what happened to Isidoro. Isidoro never came out of the alley. Reni heard two shots fired. He said that he got a glimpse of the three persons that fired the shots but that he could not see them too clearly. After running out of the alley Reni and Jaime headed towards a friend's house to call an ambulance for Isidoro. However, their other brother, Manual Aquinoza, drove by and took Reni and Jaime to South Chicago Hospital.

While at the hospital, police officers came to speak with Reni and Jaime. Reni testified that the Gangster Disciples and the Latin Kings were not the only street gangs in his neighborhood. He believed a lot of young people are in street gangs in his neighborhood. In August 1985 Reni had been a member of the Latin Kings for about two years; however, he was no longer a member. Reni further testified that as they sat in his backyard that evening neither he, Jaime nor Isidoro had any guns or weapons with them. The only reason that the three of them left the yard that night was to see what was happening.

On cross-examination, Reni testified that before 9:30 p.m. on August 9, 1985, he was at Bessmer Park, which is the park in front of his house. Reni was at the park with a couple of friends who were

also members of the Latin Kings. Neither Jaime nor Isidoro was present at the park. Reni testified he was not drinking while he was at the park and that the first beer he had that evening was at 9:40 p.m. in the backyard with Jaime and Isidoro. He testified that he only had two beers that night and to his knowledge, Jaime and Isidoro had not been drinking before 9:40 p.m.

Jaime Aquinoza testified that on August 9 and 10, 1985, he was at 8935 South Muskegon Street. He was there drinking with his brother Reni and his friend Isidoro. At the time he had known Isidoro for five years. At approximately 12:30 a.m., he heard a commotion. The three men got up to see what it was all about. The three men ran down the alley to see the source of the commotion. They went to the end of the gate and stepped out into the alley to see what was happening. When they got to the end of the alley, they saw a group of people turn down another alley, so they turned around and started to walk back to his house. Jaime said that Reni stopped to urinate while he and Isidoro kept walking down the alley. After walking about 75 feet down the alley, he got to a garage. From there he saw "three guys coming out." Jaime and Isidoro were 15 feet away from the men. When the three men came out of the gangway they shouted "gang stuff" and "they pulled out a gun and started shooting."

Jaime identified the defendant as one of the three men who jumped out of the gangway. He testified that he had seen defendant around the neighborhood for about three or four years and knew defendant by the name "Puerto Rican Roger." Jaime said that when Gonzalez jumped out of the gangway with the other two men, he had a gun in his hand. As defendant fired the gun, Jaime ran and then felt pain in his left thigh. Jaime ran towards the southeast end of the alley towards Reni. Eventually, Jaime was taken to South Chicago Hospital by another brother.

While at the hospital, Jaime spoke to Chicago police officers Moran and Garcia. Jaime told these officers that he was shot by "Puerto Rican Roger," which was the name he knew Gonzalez by. He described "Puerto Rican Roger" as 5 feet 9 inches, about 145 pounds, 23 or 24 years old with brown eyes, brown hair, medium complexion and a scar on his nose. The officers left after Jaime told them that he was shot by "Puerto Rican Roger." Later, some detectives came to the hospital. They showed Jaime some pictures. Jaime was asked to look at the photographs to see if he could identify anyone. He testified that he picked out a picture of "Puerto Rican Roger" and told the detectives that he was one of the men that jumped out of the

gangway. He also identified pictures of the other men, Orlando Rosa and Pedro Rodriguez.

Jaime testified that neither he, Isidoro, nor Reni had any guns or weapons with them on August 9 or 10, 1985. They did not want to get into a fight that night. He heard a commotion. He heard yelling but was not exactly sure of the time it started. Gang slogans were being yelled.

On cross-examination, Jaime testified that he, Reni and Isidoro were at his house at about 7 p.m. Just prior to 7 p.m. Jaime and Isidoro went to the liquor store and purchased a 12-pack of beer. Jaime had his first beer at about 7:15 on the evening of August 9, 1985. He was not exactly sure of the time the yelling started. Jaime testified that when defendant jumped out, he and Isidoro were about 15 feet from defendant. Jaime testified that he suffers from bronchial asthma. At times it is difficult to breath. However, he was able to run to the corner and down 90th Street. He was not wheezing when he got there.

On redirect examination, Jaime testified that he knew defendant the best out of all three of the men who jumped out of the gangway, that he knew defendant for a number of years, defendant was the one he knew by name, and that defendant is the one who shot him. Jaime testified that he used to be a Latin King and that he was a Latin King at the time he was shot.

Ramon Gavina testified, under subpoena, for the State. Gavina testified that in August 1985 he was a member of the Spanish Gangster Disciples. The Spanish Gangster Disciples and the Latin Kings were enemies. On August 9, 1985, Gavina was playing basketball and needed a ride home. He saw a green van pass by him. He recognized some of the guys that were in the van so he took a ride with them. There were about 10 people in the van who were Spanish Gangster Disciples. On August 9, 1989, he knew a man named Roger Gonzalez. He knew Gonzalez as "Puerto Rican Roger." Gavina identified Gonzalez in court. Gonzalez was among the people in the van. Gavina further testified that Orlando Rosa and Pedro Rodriguez were also in the van. Orlando Rosa, Pedro Rodriguez and Gonzalez were all Spanish Gangster Disciples.

Gavina testified that they drove to the park to look for Latin Kings to fight. When they saw a Latin King, everybody including Rosa, Rodriguez and Gonzalez got out of the van to chase the Latin King. The Latin King got away so they all got back into the van and drove towards 90th and Escanaba, which is Latin King territory. When they arrived at 90th and Escanaba everybody got out of the

van, including Gonzalez, Orlando Rosa and Pedro Rodriguez. Gavina said that those three split off from the group and walked towards Muskegon Street. The rest of the group were confronted in an alley by Latin Kings. He testified that they were outnumbered by about 20. Both sides were hollering gang slogans at each other. Then, the Gangster Disciples were chased out of the alley by the Latin Kings. Instead of returning to the van, Gavina went to a gang hangout called "Ritchies," where he saw Orlando Rosa, Pedro Rodriguez and other Spanish Disciples. Gavina could not remember if he saw defendant there. He further testified that he was a Spanish Gangster Disciple and a friend of Gonzalez. The prosecutor then pointed out that Gavina testified before a grand jury and said that he did see defendant at "Ritchies."

On cross-examination, Gavina testified that he was not really a member of the Spanish Gangster Disciples but was just a friend to the gang members in the van. Gavina had about a beer and a half that evening. He never saw Gonzalez with a gun on the evening of the shooting.

Gavina testified that Gonzalez's nickname was "Puerto Rican Roger." According to Gavina there were a lot of other Rogers in the neighborhood, some of whom were Puerto Rican. Gavina said no one else in the van that evening was named Roger besides defendant. Gavina testified that when the Spanish Gangster Disciples were chased out of the alley it was because they were outnumbered by the Latin Kings. The Latin Kings had bats and bottles. It was dark in the alley and there was a lot of commotion going on.

The State proceeded by way of stipulation that if called to testify, Dr. Barry Lipshultz would testify that he is a licensed medical doctor in the State of Illinois. Since 1981 he has been employed as assistant medical examiner for Cook County and is an expert in forensic pathology. On August 10, 1985, he examined the remains of Isidoro Perez. The cause of death was gunshot wounds to the victim's back. The victim's blood-alcohol level was .057 grams per milliliter.

Officer Reyes Moran testified that he has been a Chicago police officer for 7½ years. On August 10, 1985, at approximately 1 a.m., Officer Moran and his partner, Juan Garcia, received a radio dispatch indicating shots fired at 8951 South Muskegon. The officers went to that address. He testified that in the backyard or alley there was a man lying facedown who had been shot in his lower back. Officer Moran said that they later learned that the man who was shot was Isidoro Perez. Isidoro Perez was moving and moaning. The officers

asked Isidoro what happened. Isidoro said that he was just shot by "Puerto Rican Roger."

Moran further testified that he knew Roger Gonzalez from working in that area and that Roger Gonzalez was also known as "Puerto Rican Roger." Officer Moran testified that they found defendant at 9236 Commercial Avenue in a tavern. Officer Moran identified Gonzalez as the person he saw in the tavern. When the officer approached the defendant, the defendant was holding a beer. Moran approached defendant and placed him under arrest. The officers told Gonzalez that he was named as the the offender who was involved in a shooting at 8951 South Muskegon. The officers handcuffed Gonzalez and walked him to the squad car. Officer Moran testified that at that point defendant became very violent. Defendant started calling Officer Moran's partner names, kicking the doors and the glass in the squad car. Officer Moran said defendant was kind of threatening his partner. The officers then got the defendant out of the squad car and called for a wagon. Defendant was transported in a wagon to the fourth district police station. While defendant was in the squad car, Officer Moran's partner was giving defendant his rights. Defendant kept screaming, calling names and kicking the back door. Once at the police station, Officer Moran read Gonzalez his rights again. Defendant stated that he understood each right.

Officer Moran then told defendant that he was named as the offender in a shooting that occurred at 8951 South Muskegon. Defendant responded by pointing to his right eye and saying "both motherfuckers they fucked me up before."

Officer Moran testified that he interviewed Jaime Aquinoza at South Chicago Hospital. Jaime told the officers that "Puerto Rican Roger" shot him and his friend. At that time, Isidoro Perez was in the emergency room. Officer Moran never saw Jaime talking with Isidoro Perez.

Officer Moran further testified that he is Puerto Rican and that he did not go out and arrest the first Latino that he saw on August 10, 1985, and charge him with murder. Officer Moran lived in the neighborhood where the crime took place. The officers did not find any weapons in the alley. Officer Moran also told the court that all of the lights in the alley behind 8951 South Muskegon were working on August 10, 1985. On cross-examination, Officer Moran testified that he has known defendant for five years.

Officer Juan Garcia testified that he has been a Chicago police officer for six years and nine months. Officer Garcia testified that on August 10, 1985, his partner was Reyes Moran. He testified that at a

few minutes before 1 a.m. on August 10, 1985, they responded to a call at 8951 South Muskegon. At that location they found Isidoro Perez lying in the backyard facedown. Isidoro Perez was moaning, barely moving. Perez said he was shot in the back by someone named "Puerto Rican Roger." In court, Officer Garcia identified Gonzalez as "Puerto Rican Roger."

Officer Garcia testified that he spoke with Jaime Aquinoza at South Chicago Hospital. Jaime said that "Puerto Rican Roger" shot him. After Jaime gave him a description of defendant, he and Officer Moran proceeded to look for defendant. On cross-examination, Officer Garcia testified that he has known defendant for approximately 15 years.

Harold Huffman testified at trial that he was a Chicago police detective and has been a Chicago police officer for 24 years. On August 10, 1985, Detective Huffman was assigned to investigate a shooting. Officer Huffman testified that at approximately 2:15 a.m. on August 10, 1985, he arrived at South Chicago Hospital. He interviewed "Hymie Aguinaga." Detective Huffman learned the name of "Puerto Rican Roger" from "Hymie" but could not talk to Isidoro Perez because he was unconscious. Subsequently, Detective Huffman received six photographs from Area 2 violent crimes. Detective Huffman showed these pictures to "Hymie." From these pictures, he picked out one as Roger Gonzalez. A weapon was never recovered in this case. The State rested its case in chief.

Joseph Rodriguez was the sole witness to testify in defendant's case in chief. He testified that he is defendant's brother-in-law and he has known defendant's family in excess of 25 years. Joseph Rodriguez was employed as a mailman. He testified that to his knowledge defendant has never been in a gang, that defendant doesn't have any tatoos and has never heard anyone refer to Gonzalez as "Puerto Rican Roger." Joseph Rodriguez testified that he has known Officer Garcia over 20 years and that he has never been present during any conversations involving Officer Moran or Garcia in which the officers referred to Gonzalez as "Puerto Rican Roger."

On cross-examination, Joseph Rodriguez testified that he loves the defendant and is very close with him. He stated that he got defendant a job. He also tried helping Rosa. He did not know that Rosa was affiliated with the Spanish Gangster Disciples. The prosecutor showed Rodriguez a picture of codefendant Orlando Rosa with a tatoo of a crown with "SG" in the middle. Rodriguez said that Gonzalez is not a Spanish Gangster Disciple and he denied knowledge of a gang called the Spanish Gangster Disciples in his neighborhood. He testified that

there are Latin Kings in that area. He knew that because "LK" was written all over the walls. When Joseph Rodriguez was asked whether "SGD" was painted on the walls, he testified that there is a lot of grafitti in the neighborhood and he does not pay too much attention. He said there might be "SGD" painted on the walls. According to Rodriguez, there are other gangs in that neighborhood called VMP and Cobras. He testified that he never saw "SGD" nor heard of it. Joseph Rodriguez said that the only organization he knew that defendant belonged to was the Longshoremen. He knew this because he got Gonzalez in the union. Rodriguez testified that both he and defendant knew Officers Moran and Garcia from the neighborhood. Rodriguez stated that he had been a police officer in East Chicago for three years and that he played ball with Moran and Garcia.

Subsequently, defendant was found guilty of the murder of Isidoro Perez and the attempted murder of Jaime Aquinoza. Defendant appeals from this conviction.

Defendant raises the following six issues on appeal:

(1) Whether the prosecution's rebuttal closing argument denied defendant a fair trial.

(2) Whether defendant was denied a fair trial when the trial judge made comments in the presence of the jury that the evidence established that defendant was the person named "Puerto Rican Roger," who was implicated as the shooter by State witnesses, thus invading the province of the jury.

(3) Whether during jury selection proceedings, the trial court erred in instructing the jury venire.

(4) Whether defendant was denied a fair trial by the prosecutor's use of insinuation and innuendo, during cross-examination of a defense witness, to insinuate that the defense witness had been "kicked off" the police force.

(5) Whether defendant was denied a fair trial by the trial court's preventing impeachment of a State eyewitness.

(6) Whether defendant was denied a fair sentencing hearing.

If the evidence in this case was closely balanced we would have to reverse and remand due to the accumulation of errors; however, this is not a close case. The evidence proves beyond a reasonable doubt that Gonzalez committed the crimes. However, as in codefendant Orlando Rosa's case, we must remand the case for resentencing. Therefore, for the following reasons, we affirm in part, vacate in part, and remand for resentencing.

The State contends that the issues defendant raises on appeal were waived by the failure to file a post-trial motion. Generally, fail-

ure to specify grounds for a new trial in writing in a motion for a new trial constitutes waiver of the issue on review in the absence of plain error. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) The failure to file any post-trial motion constitutes a waiver of all errors raised on appeal. (*People v. Knowles* (1979), 76 Ill. App. 3d 1004, 395 N.E.2d 706.) However, to ameliorate the severity of the waiver rule, Supreme Court Rule 615(a) allows the reviewing court to consider plain errors or defects appearing on the record which affect substantial rights of the defendant although not brought to the attention of the trial court. (134 Ill. 2d R. 615(a); *People v. Schmidt* (1988), 168 Ill. App. 3d 873, 522 N.E.2d 1317.) "Plain error is an error which deprived the defendant of a fair and impartial trial or any substantial error which occurs in cases where the evidence is closely balanced." (*Schmidt*, 168 Ill. App. 3d at 878.) The plain error doctrine provides that a court of review may notice waived errors if either the evidence is closely balanced or the error is fundamental and of such magnitude that the accused was denied a fair trial and remedying the error is necessary to preserve the integrity of the judicial process. (*People v. Herrett* (1990), 137 Ill. 2d 195, 561 N.E.2d 1.) As hereinafter discussed, the evidence in this case is not closely balanced and we find no plain error on the record in this case.

Additionally, where a claim of ineffective assistance of counsel is based upon counsel's failure to file a post-trial motion, consideration of the trial errors alleged on appeal is compelled, to determine whether any such contentions are of substantial merit. (*People v. Knowles* (1979), 76 Ill. App. 3d 1004, 395 N.E.2d 706.) In the present case, defense counsel did not file a post-trial motion and the defendant argues that this action or inaction resulted in ineffectiveness of counsel. As discussed later in this opinion, we do not find that the defendant was denied effectiveness of counsel. However, in light of the ineffectiveness of counsel claim, we consider the trial errors alleged on appeal in order to properly determine whether any of defendant's contentions are meritorious.

I

■ Defendant argues that the prosecution's rebuttal closing argument denied him a fair trial where the prosecutor made statements which shifted the burden of proof to the defendant, commented on his failure to testify, expressed his personal opinion that defendant was guilty and expressed personal characterizations of defendant and a defense witness in a highly prejudicial manner as well as making other improper comments.

The following are excerpts from the prosecutor's rebuttal closing argument:

"He [defense counsel] gets up here and he talks about you're supposed to decide just the facts and only the facts in this case. Well, the facts in this case are uncontradicted, yet he tries to some way suggest to you without giving you any evidence that you shouldn't accept the facts. The facts are what came from the witness stand.

* * *

You know, I can never understand when a defense attorney gets up here and he preaches for fifteen, twenty minutes that his guy didn't do it, that we didn't prove it, and I have no quarrel that this is America and we have to prove people guilty beyond a reasonable doubt. I accept that. And we've done that. But he gets up here and says * * * he still wants to hear more witnesses. Well, my guy didn't do it but they should still have more witnesses. Still wants to say he didn't do it if we parade in a bus load of people?

You want to know where the other witnesses are? One's in a cemetery. He's dead. And the other two came here, Jaime and Reni, and the rest of the witnesses, well, you can ask Puerto Rican Roger where they are. They're all his Latin King buddies. Rosa and this mope out there. Those are the people that are their witnesses. We don't get to pick them. Don't get confused about that. The people that were shot came in here. They have nothing to hide. Like his brother-in-law. You think the brother-in-law doesn't know him as Puerto Rican Roger? Not my brother-in-law. You think he has a reason to lie? People like that make me sick to my stomach. They spit in your face. They lie to you. For what? To let this guy back on the street to shoot another guy in the back.

Don't accept that stuff consider the gun. Ask him how do I know where the gun is? He didn't turn it into the police. His buddies didn't turn it into the police. His brother-in-law didn't turn it into the police. You want to know where the gun is? Ask your client. Don't ask the State.

* * *

And he [defense counsel] has the audacity to say about those officers when they got back there and talk to this kid who's bleeding to death in the yard, all we have is their word. What is that? Is it supposed to mean we're not supposed to believe those guys because they're police? * * *

Give me a reason. Mr. Dennis [defense counsel] give you people a reason, one single iota of reason why we can't believe those two police officers? I waited for one. I didn't hear one. The only reason he doesn't want you to believe them, because when you do believe them this guy is guilty. He goes down. Case is over. Good-by Puerto Rican Roger. ***

They talk to this kid in the alley, and I waited for another reason of this. *** If you're lying there dying, bleeding to death in an alley, you don't know whether you're going to live or die ***. I don't think you're going to look that police officer in the eye, go through that little memory deck you got in your head and pick out somebody you don't like and blame it on him. ***

* * *

You know, I'm not fond of Jaime and Reni Aguinaga [sic] because they are Latin Kings, but I didn't bring them here to entertain you. I brought them here because he shot them. And counsel gets up and says he's sorry about what happened to him. Well, if he's so sorry about everything that went on, how can he bring in this guy to lie here, this brother-in-law. What kind of sorrow is that? You know ***."

At this point defense counsel objected. The trial court sustained the objection and stated, "We didn't want counsel to be criticizing ***." Defense counsel also asked for a sidebar. The trial court responded, "In a minute" and allowed the prosecutor to continue.

Although we agree with Gonzalez's appellate counsel that the argument was unfair and should not have been made, due to the overwhelming evidence of guilt, we do not believe it was reversible error.

Defendant first argues that one noticeable feature of the prosecutor's rebuttal closing argument was the prosecutor's shifting the burden of proof to the defense and calling attention to the defendant's failure to testify.

The accused has a constitutional right not to testify on his own behalf. (*Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229.) The prosecutor may not directly or indirectly comment on the defendant's failure to take the stand in his own defense. (*People v. Lyles* (1985), 106 Ill. 2d 373, 390, 478 N.E.2d 291.) A reviewing court must examine the prosecutor's remarks in the context of the entire proceeding, to determine whether the challenged remarks were improper comments on the accused's failure to testify. (*People v. Arman* (1989), 131 Ill. 2d 115, 545 N.E.2d 658.) Even if the defendant is the only one who could have contradicted the State's evi-

dence, the prosecutor may describe the State's evidence as uncontradicted, provided it was not " ' "intended or calculated to direct the attention of the jury to the defendant's neglect to avail himself of his legal right to testify." ' " (*People v. Lyles* (1985), 106 Ill. 2d 373, 390, 478 N.E.2d 291, quoting *People v. Hopkins* (1972), 52 Ill. 2d 1, 6, quoting *People v. Mills* (1968), 40 Ill. 2d 4, 8, 237 N.E.2d 697.) Where defense counsel provokes a response, defendant cannot complain that the reply denied him a fair trial. *People v. Dixon* (1982), 91 Ill. 2d 346, 350-51, 438 N.E.2d 180.

Defendant also argues that the prosecutor made improper arguments expressing personal opinions and personal emotions about the evidence and witnesses. First, the prosecutor referred to the defendant as "this mope out there." Although the prosecutor should not have referred to the defendant as a mope, the comment did not rise to the level of reversible error.

The defendant argues that even more noticeable as expressions of the prosecutor's personal opinions were the prosecutor's comments on the defense witness Joseph Rodriguez. The prosecutor argued: "People like that make me sick to my stomach. They spit in your face. They lie to you. For what? To let this guy back out on the street to shoot another guy in the back." The prosecutor also argued that Rodriguez, who was not implicated in any way in the crime, did not turn the murder weapon in to the police. The prosecutor also expressed his personal opinion of defendant's guilt by arguing: "You know he's the killer ladies and gentlemen, and I ask you to tell him that because I've told him that. He doesn't care what I say." Defendant further argues that another improper prosecutorial argument was the argument regarding a defense attorney preaching for 15 to 20 minutes that his guy didn't do it.

In general, a prosecutor may not express his personal opinion about the defendant's case or make personal attacks against the defendant's attorney. (*People v. Lyles* (1985), 106 Ill. 2d 373, 391, 478 N.E.2d 291.) In *People v. Morrison* (1985), 137 Ill. App. 3d 171, 484 N.E.2d 329, the defendants claimed that they were denied a fair trial because of numerous improper and prejudicial remarks made by the prosecution in closing argument. Specifically, the defendants argued that the prosecution improperly accused defendants of hiding evidence; referred to defense counsel's "cheap tricks," "dramatics," and attempts to "detract," "confuse," and "insult"; and characterized the defense as one of "conspiracy and persecution." The court concluded, after reviewing the arguments in their entirety, the prosecution's comments were either waived by defendant's failure to timely object,

were within the bounds of proper closing argument or, if improper, in light of the overwhelming evidence of defendant's guilt did not constitute a material factor in their conviction.

Prosecutors are afforded great latitude in their closing arguments and any improper arguments are not reversible error unless they cause the jury to convict where it would have otherwise acquitted. (*People v. Moman* (1990), 201 Ill. App. 3d 293, 558 N.E.2d 1231.) " 'Where it appears that improper remarks do not constitute a material factor in the conviction *** the verdict will not be disturbed.' " *People v. Fields* (1974), 59 Ill. 2d 516, 522, 322 N.E.2d 33, quoting *People v. Berry* (1960), 18 Ill. 2d 453, 458, 165 N.E.2d 257; see also *People v. Morrison* (1985), 137 Ill. App. 3d 171, 484 N.E.2d 329.

Although we conclude that the prosecutor made various improper comments, we do not believe the improper remarks constituted a material factor in the defendant's conviction. We certainly do not condone the prosecutor's remarks; however, this was not a case in which the evidence was closely balanced or one in which the errors were of such a character that the plain error rule must be invoked to preserve the integrity and reputation of the judicial system. The case against Gonzalez was unusually strong. Defendant was identified by both victims. Jaime Aquinoza identified the defendant through photographs shown to him by the police shortly after the shooting as well as making an in-court identification. Jaime testified that at the time of the shooting he and Isidoro were 15 feet away from the defendant. Isidoro Perez told two police officers that he was shot by Puerto Rican Roger. Numerous witnesses testified that Gonzalez was known by the name Puerto Rican Roger.

Accordingly, for the reasons set forth above we do not believe the prosecutor's improper remarks require a reversal in this case.

II

Defendant argues that he was denied a fair trial when the trial judge made comments in the presence of the jury that the evidence established that the defendant was the person named Puerto Rican Roger, who was implicated as the shooter by State witnesses, thus invading the province of the jury.

During Officer Moran's testimony, the following occurred:

"Q. I'd ask you to look around this courtroom and tell the people on this jury if the person you saw in that tavern, Puerto Rican Roger, is in this courtroom?

A. Gentleman with the white sweater.

[DEFENSE COUNSEL]: I'd object to the Puerto Rican Roger. Roger Gonzalez is the defendant's name.

THE COURT: Evidently from the testimony he's known by that name."

■ The trial court did not state unequivocally that Roger Gonzalez was Puerto Rican Roger. When the trial court made the statement, it was responding to the defense counsel's objection to the characterization of Gonzalez as Puerto Rican Roger. At that time, testimony indicated that Gonzalez was also known as Puerto Rican Roger. Officer Moran's identification of defendant as Puerto Rican Roger came after Jaime Aquinoza and Ramon Gavina both identified defendant as Puerto Rican Roger. Officer Moran did not identify defendant in court until after he testified that Isidoro Perez told him just before he died that he was shot by Puerto Rican Roger. Officer Moran also testified that he and his partner knew Puerto Rican Roger by the name Roger Gonzalez. Officer Moran knew Gonzalez from the neighborhood and working in the area. Moreover, just prior to the aforementioned quote, the prosecutor asked the officer, without objection from defense counsel: "When you knew that it was Puerto Rican Roger or Roger Gonzalez, what did you do?" We do not see how the trial court's comment constituted an invasion of the jury's role as trier of fact.

A trial court's comments do not constitute reversible error unless "they 'constituted a material factor in the conviction or were such that an effect on the jury's verdict was the probable result.'" (*People v. Batchelor* (1990), 202 Ill. App. 3d 316, 328, 559 N.E.2d 948, quoting *People v. Harris* (1988), 123 Ill. 2d 113, 526 N.E.2d 335.) Jaime Aquinoza identified Gonzalez as one of the three men who jumped out of the gangway. Jaime testified that he saw Gonzalez fire the gun. In light of this evidence we cannot find that the trial court's comment constituted a material factor in the conviction or was such that an effect on the jury's verdict was the probable result. Accordingly, we find the trial court's comment did not amount to reversible error.

During the cross-examination of Mr. Gavina, the following exchanges occurred:

"Q. [DEFENSE COUNSEL]: Does Roger Gonzalez have a nickname?

A. Well there's a lot of Rogers around that area.

THE COURT: The question is did Roger Gonzalez have a nickname. Just answer that question.

A. [THE WITNESS]: I was answering, sir. Well, like I'm answering.

THE COURT: I don't want to hear about a lot of Rogers around the area. Answer that question.

A. [THE WITNESS]: Okay. Well to me he was known as Puerto Rican Roger because there's Mexican—

THE COURT: He was known as Puerto Rican Roger?

A. I called him that, right."

Defendant argues that the court biased the jury's deliberations on the "Puerto Rican Roger" issues by these comments, which conveyed the view that any testimony as to other persons who might fit that name was out of bounds. Defendant further argues that the court's following up these comments with the question "He was known as Puerto Rican Roger?" placed the court in the role of a prosecutor, pinning the witness down to an answer which favored the State's position. Defendant maintains that he was denied his right to a fair and impartial trial by jury.

An issue in this case was whether the person who shot Jaime Aquinoza and Isidoro Perez was a person called "Puerto Rican Roger" and whether Gonzalez was so nicknamed. It is not an abuse of a trial judge's discretion to question witnesses in an attempt to clarify points of testimony or eliminate confusion and curtail repetition. (*People v. Batchelor* (1990), 202 Ill. App. 3d 316, 328, 559 N.E.2d 948.) A court has discretion to admonish a witness who had a tendency to make voluntary answers not called by the question asked, and it is not error for the court to intervene to confine the witnesses' answers. *People v. Kukulski* (1934), 358 Ill. 601, 609, 193 N.E. 504.

We note that although Gavina was a State's witness, he was testifying pursuant to a subpoena. Gavina testified first that he was a member of the Spanish Gangster Disciples and then that he was a friend to that gang. Gavina had begun to answer a question that was not asked of him. The trial judge directed Mr. Gavina to answer the question that was asked of him and confined his answer accordingly. We find no merit to Gonzalez's argument on this issue.

### III

Third, defendant argues that during jury selection proceedings, the trial court erred in instructing the jury venire and the attorneys that the juror's involvement in pending litigation would only disqualify the individual if it caused him or her to be partial with respect to the instant case, whereas such involvement is an automatic statutory disqualification from jury service. Defendant asserts that the trial court committed reversible error during the jury selection proceedings by giving instructions to the venire that potential jurors' involvement

in pending lawsuits was not an automatic ground for removal from the jury but, at best, was a question which might be relevant for purposes of inquiry or peremptory challenge by the attorneys. Defendant maintains that the ruling of trial court constituted twofold error in that (1) it erroneously prevented jurors from revealing their involvements in lawsuits, and (2) it erroneously instructed the attorneys that such involvement, in the judge's opinion, was not grounds for automatic removal of the juror from the venire "for cause," contrary to the relevant statute. See Ill. Rev. Stat. 1989, ch. 78, par. 14.

At the outset of jury selection, the court addressed the following to the entire venire, en masse:

"THE COURT: How many of you have ever been a party to a lawsuit or a courtroom case. That is, how many have ever been a plaintiff or a defendant in any kind of a court case or have been summoned to appear in court to testify, or did appear in court and testify?

Quite a few people. Okay.

The question now is this: Court cases are contests between persons or groups of persons. When they are over, ordinarily there is a winning side and a losing side, and it happens if sometimes people connected with the losing side of a case feel that justice has not been properly served. So the question narrows down to this: Do any of you who are involved in any kind of litigation experience, or believe that you experienced something of that kind, [have] something that you harbor or that might cause you to be unable to be a fair and impartial juror in someone else's case? That is the question. Anybody?"

Section 14 of the Jury Act (Ill. Rev. Stat. 1989, ch. 78, par. 14) provides, in pertinent part:

"14. Causes for challenge.

It shall be sufficient cause of challenge of a petit juror that he *** is a party to a suit pending for trial in that court. It shall be the duty of the court to discharge from the panel all jurors who do not possess the qualifications provided in this Act, as soon as the fact is discovered." Ill. Rev. Stat. 1989, ch. 78, par. 14.

Defendant argues that during colloquies with a few jurors who responded, the court made it all the more clear that it regarded involvement in litigation not to be a matter of automatic disqualification, but at best a starting point for possible questioning or a matter leading to possible peremptory challenges. We disagree.

Prospective juror Rosiak indicated that he was involved in a criminal court case approximately a year and a half ago. When he indicated that he was accused of striking a child, the court immediately excused him. Prospective juror Rosner indicated that her son, who was now 36, had been involved in a case when he was 17. The court questioned whether the juror could be fair and impartial in this case and the juror indicated that she could.

Subsequently, the following colloquy took place involving prospective juror Hardy:

"There's some things I feel that I cannot discuss here; I do not want to prejudice anybody else that might be a prospective juror, but I have lived in the area 30 years and have had 20 years of a lot of headaches and so forth.

THE COURT: Wait, wait.

PROSPECTIVE JUROR HARDY: Things might go on in this case—.

THE COURT: We are talking right now about people who have been involved in a court case, have been involved in court cases.

PROSPECTIVE JUROR HARDY: Yes, I have, but it isn't the basic problem.

THE COURT: Well, the other things we will get to. Thank you.

Is there someone else involved in a court case?"

Prospective juror Hardy was never called as one of the 12 people to potentially sit on the jury in this case. Although Mr. Hardy's comments clearly indicate that he was hesitant to serve as a juror and that it is questionable whether he would have been impartial, his comments do not indicate that he was a party to a pending case.

Prospective juror Hosken indicated that she and her husband were codefendants in a personal injury suit. She indicated confusion about the fact that there were three codefendants. The court responded that in this case there was only one person on trial. The prospective juror then indicated that she would try to be fair about it, although she was not sure that she could. The court stated that that was another matter and the court would get to that when it went through the paneling. After further questioning the State exercised a peremptory challenge to excuse prospective juror Hosken.

■ We do not believe that the trial court's remarks gave an indication that the trial court believed that the fact that a juror is a party in a pending case in that court is a discretionary disqualification. We find that the trial court's remarks were not only aimed at identifying

those prospective jurors who were a party in a pending case, but its comments were also aimed at identifying those jurors who might harbor prejudices or biases as a result of a past experience in the court system. Past experience with the court system does not automatically disqualify a prospective juror.

We note that after questioning the third prospective juror as to any involvement ·with the legal system the trial judge stated: "Is there someone else involved in a court case?" Clearly, the trial judge was not limiting any examination regarding those prospective jurors that may have been involved in current litigation.

The trial court does not have the discretion to allow a prospective juror to sit when that juror is subject to statutory disqualification. (*People v. O'Malley* (1986), 143 Ill. App. 3d 474, 493 N.E.2d 82.) However, the Illinois Supreme Court has stated that a defendant, having failed to use his peremptory challenges, is in no position to complain concerning jury selections. (*People v. Ford* (1960), 19 Ill. 2d 466, 475, 168 N.E.2d 33.) In *People v. Cunningham* (1970), 123 Ill. App. 2d 190, 260 N.E.2d 10, the court held that the fact that defendant had 19 unused peremptory challenges at the time the jury was sworn indicated that the attorneys for the defendant were of the opinion that the selected jurors represented fair and impartial triers of fact.

Four prospective jurors were excused for cause by the trial judge. The State exercised one peremptory challenge and the defense exercised six peremptory challenges. Had Gonzalez used all of his peremptory challenges and attempted to challenge a juror for that reason and was denied, it would have been reversible error. In this case the record reflects Gonzalez did .not use up his allotted peremptory challenges. As a result, he is in no position to complain. We find nothing in the judge's remarks that curtailed the defendant's right to make the cited statutory challenge. A review of the transcript of the *voir dire* reveals no evidence that the trial court violated the provisions governing jury selection. Accordingly, we find Gonzalez's argument without merit.

IV

Defendant argues that he was denied a fair trial by the prosecutor's use of insinuation and innuendo, during cross-examination of a defense witness, to insinuate that the defense witness had been "kicked off the police force."

Joseph Rodriguez was a long-time resident of the area in question and was the brother-in-law of Roger Gonzalez. During cross-examination of Rodriguez, the prosecutor asked him if he ever helped the co-

defendant Rosa, and the witness testified that he did so "because I'm community involved." In later cross-examination, the following occurred:

"Q. All this community involvement, have you ever worked with the police to help stamp out the gangs in the neighborhood?

A. I'm an ex-cop myself.

Q. From who [sic]?

A. From East Chicago.

Q. Did you get kicked off the force or resign?

A. No, I resigned.

Q. When?

A. 1971.

Q. How long were you on the force?

A. Three years."

Defendant argues that it can thus be seen that the State raised questions in the minds of the jury that Rodriguez, who gave important testimony for the defense, was a former police officer who had been "kicked off the force," thus raising suggestions of corruption, malfeasance or worse.

The defense relies on *People v. O'Banner* (1991), 215 Ill. App. 3d 778, 794, 575 N.E.2d 1261, which held:

"Error occurs when the State, on cross-examination, asks a defense witness questions, presuming facts not in evidence, as a precursor to impeachment of that witness, in the absence of rebuttal evidence to substantiate the inquiry. [Citations.] The danger inherent in such questioning is that the jury will ignore any denial, presume the accuracy of the questions' insinuation or innuendo, and substitute that presumption for proof. [Citations.]"

Defendant maintains that the State used "innuendo" which was very likely to have caused the jury to suspect the witness of serious misconduct, denying defendant a fair trial.

To suggest that a witness was kicked off a police force when he, in fact, resigned is wrong. It is unfair to the witness as well as the defendant. If this were a close case the question would require a reversal; however, as we have previously indicated this was not a close case. At best in the light of the State's strong case it was harmless error. The question and answer have nothing to do with Gonzalez's guilt. The question and answer may have been prejudicial to Rodriguez, but as to Gonzalez it was harmless.

Joseph Rodriguez voluntarily stated that he is an ex-police officer. The prosecutor asked the witness whether he was fired or if he resigned. The witness answered that he resigned, and the prosecutor ended that line of questioning. The prosecutor did not pursue this line of questioning nor did he dwell on it. Once the witness testified that he had resigned, the prosecutor did not question that fact and the witness' statement that he resigned remained uncontested and uncontradicted.

## V

Defendant argues that he was denied a fair trial by: (A) the trial court's preventing impeachment of a State eyewitness; (B) the court's barring testimony by a defense witness bearing on the bias of State witnesses; (C) testimony that defendant's photo was obtained from a police station; and (D) defense counsel's ineffectiveness.

## A

Defendant asserts that an initial trial error, while perhaps not constituting independently reversible error, was prejudicial with other errors cited in defendant's brief. This alleged error related to the testimony by the two State eyewitnesses, Reni and Jaime Aquinoza. Defendant notes as background to the issue that their testimony was questionable and could raise suspicion that they were participants in the incidents rather than spectators as they claimed. Defense counsel argues the following: Both brothers were members of the Latin Kings gang but claimed that they were spending a quiet evening in their backyard, drinking beer, when they heard numerous voices, from opposite ends of the alley, shouting the opposing slogans of their gang and its bitter enemies, the Spanish Gangster Disciples, which signaled a dangerous gang altercation. Reni claimed he was at the park until 9:30 p.m., whereas Jaime testified that Reni was in the backyard from 7 p.m. onward. They also gave conflicting testimony that after the tumult and the shouting, a large number of their own gang members passed by in pursuit of the Disciples, yet they moved too slowly to join their gang, and also they did not recognize any of their fellow gang members. Reni further testified that he, his brother and the deceased merely "walked" after the Latin Kings, and when the Kings disappeared down an alley "we figured something just passed by," so they headed for home. Jaime testified that they initially stepped out of the gate to see what happened, and that he walked up to his brother, but then they all "ran" down the alley.

The defendant asserts that because of the doubtful nature of the Aquinoza brothers' testimony, it was important for the defense to expose further weaknesses in their testimony, lest the jury be "hoodwinked" by these doubtful witnesses. Defendant alleges that counsel partially did this by eliciting from Jaime that he suffered from bronchial asthma, which tended to undermine his account that he ended up sprinting down the alley. Defendant contends the trial court prevented defense counsel from adding stronger support to this impeachment by barring testimony that the summer before, Jaime had been in the hospital three times with asthma attacks. Defendant maintains that the fact that Jaime had to go to the hospital three times for asthma attacks was conduct inconsistent with his allegedly sprinting down the alley.

The purpose of cross-examination is hopefully to bring out the ultimate truth, not to question a party on completely irrelevant matters. A trial judge must of necessity determine the scope of cross-examination on any issues of relevancy and his rulings will not be disturbed unless there is a clear abuse of discretion leading to manifest prejudice. (*People v. Davis* (1974), 19 Ill. App. 3d 709, 312 N.E.2d 360.) The Illinois Supreme Court has long noted that the latitude allowed on cross-examination is a matter within the sound discretion of the trial court and a reviewing court will not interfere unless there has been a clear abuse of discretion resulting in a manifest prejudice to the defendant. (*People v. Sandoval* (1990), 135 Ill. 2d 159, 194, 522 N.E.2d 726; *People v. Collins* (1985), 106 Ill. 2d 237, 269, 478 N.E.2d 267.) Based on the above rule, we reject counsel's argument that the trial judge improperly sustained an objection to the cross-examination of Jaime Aquinoza as to his stay in hospitals due to asthma attacks the previous summer.

## B

Defendant argues the trial court erred in barring testimony by defense witness Joseph Rodriguez which bore on the bias of an important State witness, Officer Garcia, and by extension, on the bias of his partner, Reyes Moran, as well. Both officers testified that the deceased named "Puerto Rican Roger" as the person who shot him. Officer Moran also testified to an alleged statement by the defendant which might have been taken by the jury as incriminating.

Defendant argues that the court committed reversible error by barring two types of testimony by Joseph Rodriguez, defendant's brother-in-law, which indicated the potential bias of Officers Garcia and Moran. First, defense counsel indicated that Rodriguez had testi-

fied against one of Officer Garcia's relatives in a gang-related criminal case in Markham involving a shooting and that, afterward, Officer Garcia's mother threatened Rodriguez. Defendant argues that the proposed testimony by Rodriguez provided important information to the jury for evaluating the testimony of Officer Garcia, and by extension, his partner, since his partner would be prone to ally himself with Garcia's biases. Defendant alleges that the proposed testimony by Rodriguez showed a natural bias by members of the Garcia family against members of the defendant's family with respect to the very subject of the instant prosecution, namely, gang shootings, except in a case where it was Officer Garcia's relative who was accused of such a crime.

Additionally, defense counsel argued at a sidebar conference that Rodriguez would testify that the officers did not like Teddy Gonzalez, defendant's brother, and that Rodriguez had seen Teddy at parties with Officer Garcia's wife. Co-counsel for the defense stated that it was either Officer Garcia's wife or Officer Moran's wife, and that counsel would have to check his notes. The court ruled: "It's a remote circumstance. It means nothing." Defendant argues that the fact that a brother of the defendant was romantically involved with Officer Garcia's wife, and that the officers simply did not like defendant's brother, could well have added to their bias against the defendant and thus, under the rule of "wide latitude," the testimony should have been allowed and the weight to be given this evidence should have been for the jury to determine.

In *People v. Triplett* (1981), 99 Ill. App. 3d 1077, 1084, 425 N.E.2d 1236, the court stated:

> "The trial court is vested with substantial discretion to determine both the manner and scope of cross-examination. [Citation.] This rule applies even where the purpose of the cross-examination is to show a basis for bias, interest or motive to testify falsely. [Citation.] Although it is true that a witness may be impeached by a showing of interest, bias, or motive to testify falsely, such evidence need not be admitted where it is remote or uncertain. [Citations.]"

Defense counsel did not question either of the officers about this information. When defense counsel was asked why the officer wasn't asked about these things, defense counsel replied: "They came to our knowledge when we talked to this witness last night, your Honor. *** We were not aware of the specifics until we talked to him last night."

We do not believe that the trial court abused its discretion in determining that the above matters were remote to the issue of defendant's guilt.

## C

The defendant argues that a third error which occurred at trial consisted of testimony that the police obtained a photograph of Gonzalez from Area 2 police headquarters, thus suggesting he had a police record. Defense counsel's motion to strike the testimony was denied on the dual grounds that (1) counsel had failed to object the first time the question about the photo was asked, and (2) it was necessary for the State to explain where the photo came from. Defendant asserts that even if counsel was slightly tardy in his initial objection, he did object when the question was asked again, and in any event, he had a right to strike the testimony later.

During Detective Huffman's testimony, he described the investigation he conducted. He spoke with "Hymie Aguinaga" at South Chicago Hospital. Then he spoke with Officers Garcia and Moran. He asked the officers if they knew Gonzalez, to which the officers responded that they were very familiar with him and that they were in the process of looking for him. Detective Huffman said he conducted further investigation. In response to a question about what kind of investigation, he responded:

> "I called back to Area 2. I talked to Eddie Lerez to see if we had any photos of a Roger Gonzalez in that area 22 years of age. If he could find that and bring it to me with a group of photos of similar people Mexicans, Hispanics."

The prosecutor then asked, "Did Lerez find any photographs of Gonzalez over at Area 2." Defense counsel then asked for a sidebar. Defense counsel objected that the pictures could have the devastating effect of indicating that Gonzalez had been convicted of a crime. Gonzalez had never been convicted of a crime. Defense counsel asked that no mention of the fact that the pictures came from Area 2 be made. The prosecutor indicated that he had cut the pictures in half so the jury would not see Chicago police mug booking, all the jury would see was the individuals' faces. The defense responded that it all came out that the pictures came from Area 2 violent crimes. The court indicated that the defense did not object and the defense asked that the answer be stricken. The court stated, "No, you have to show that the pictures came from someplace. It will have to stand."

The State maintains that the photograph was not used for the purpose of showing that defendant had committed prior crimes, but

rather as the photograph in which a victim first identified defendant as the offender. The prosecution cut away any indication that the picture was a mug shot.

Evidence showing that the defendant committed prior criminal offenses is improper where its purpose is to demonstrate the defendant's propensity to commit crime. (*People v. McDonald* (1975), 62 Ill. 2d 448, 455, 343 N.E.2d 489.) Evidence which suggests or implies that the defendant has a criminal history should not be admitted unless somehow relevant. *People v. Bryant* (1986), 113 Ill. 2d 497, 514, 499 N.E.2d 413.

In *People v. Hayes* (1990), 139 Ill. 2d 89, 146, 564 N.E.2d 803, testimony was introduced that a witness identified the defendant's photograph from a book at Area 1 violent crimes. The Illinois Supreme Court held that while the testimony may have raised an inference in the jurors' minds that the defendant had a criminal history, the detective did not suggest that the witness chose the defendant's photograph from a book containing "mug shots" or photographs of persons who had previous contact with police. In the present case, as in *Hayes*, there was no direct evidence that the defendant had engaged in criminal conduct prior to the offense for which he was being tried.

It is within the discretion of the trial court to decide whether evidence is relevant and admissible, and the trial court's decision will not be reversed absent a clear abuse of discretion resulting in manifest prejudice to the defendant. (*Hayes*, 139 Ill. 2d at 130.) The court in *Hayes* stated, "The consequential steps in the investigation of a crime and the events leading up to an arrest are relevant when necessary and important to a full explanation of the State's case to the trier of fact." *Hayes*, 139 Ill. 2d at 130, citing *People v. Johnson* (1986), 114 Ill. 2d 170, 194, 499 N.E.2d 1355.

In a sidebar conference the trial judge ruled that it was necessary to elicit testimony from the police officer about the origin of the photographs shown to Jaime Aquinoza. The pictures had originated from Area 2 headquarters. The pictures established the witness' identification as the offender. No suggestion was made that the photo was taken because of Gonzalez's arrest for another crime. The only mention of "Area 2" was the fact that it was from that location that Detective Huffman received the picture. It was used by the police in the identification of Gonzalez. Nothing in the record disclosed or implied that the photograph was used as evidence of a prior crime by Gonzalez. We conclude that the trial court did not abuse its discretion in allowing testimony that the picture originated at Area 2.

## D

Finally, defendant argues that he was denied a fair trial by ineffective assistance of counsel. Defendant asserts that trial counsel withdrew a valid motion to suppress statements based on erroneous assumptions and failed to file a post-trial motion.

As to counsel's withdrawing the motion to suppress, during trial, Officer Moran testified he gave Gonzalez *Miranda* warnings, Gonzalez waived them and that he pointed to his eye and said "both mother-fuckers they fucked me up before." Prior to trial, witnesses had testified extensively on a motion to suppress statements filed by defense counsel. During this testimony, defense counsel allegedly developed a number of potential points which he could have used to argue that the defendant's alleged statement to Officer Moran was not intelligently or voluntarily entered, and that he did not validly waive his constitutional rights. Defendant asserts that these grounds for excluding the statement included intoxication, incredibility of the officers' testimony on the motion in that, according to the officers, the defendant violently resisted the *Miranda* warnings in the police car, yet calmly waived them 15 minutes later in the police station, and the fact that one of the officers' *Miranda* cards was defective. However, after numerous continuances, on the date set for arguing the motion to suppress statements, defense counsel withdrew his motion on the grounds that: (1) there was probable cause for the arrest, and (2) the only evidence to be suppressed was a denial of the crime by Gonzalez (defendant asserts that this was an erroneous statement by counsel).

At trial, when it became apparent that the State intended to introduce the alleged statement to Officer Moran rather than a mere denial, counsel renewed the motion to suppress on the ground that the alleged statement described by Officer Moran had not been mentioned during the pretrial motion hearing, and again, that the only statement revealed at the hearing was a denial by the defendant to an assistant State's Attorney. After a recess in which counsel consulted his materials, however, counsel stated he had erred in believing defendant made no additional statements besides the denial and abandoned the motion. Meanwhile, the State pointed out that defense counsel had ample discovery of the alleged statement to Moran.

Defendant argues that defense counsel abandoned a motion to suppress statements which had developed viable grounds for challenging the admissibility of a statement by the defendant, because of a mistaken recollection on counsel's part that the State did not intend to introduce the statement. Defendant maintains that, had counsel not

made such an error, he would have argued the motion to the court and might have prevailed.

In addition, defendant points out that trial counsel failed to file any post-trial motion. Defendant contends that he had shown that a substantial number of errors occurred at trial and counsel's failure to file a post-trial motion subjected the defendant to the rule of "waiver" on appeal under cases such as *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124. As previously stated, where a claim of ineffective assistance of counsel is based upon counsel's failure to file a post-trial motion, consideration of the trial errors alleged on appeal is compelled, to determine whether such contentions are of substantial merit. (*People v. Knowles* (1979), 76 Ill. App. 3d 1004, 395 N.E.2d 706.) Where there are no substantial grounds for a new trial, a failure to move for one cannot demonstrate incompetency. (*People v. Purnell* (1984), 126 Ill. App. 3d 608, 624, 467 N.E.2d 1160.) Nothing in the record suggests that a post-trial motion or a motion to suppress would be successful. We have considered each of the issues "waived" by the failure to file a post-trial motion and find that defendant has not demonstrated that he is entitled to a new trial. We have found no rule of constitutional law that suggests that a defense counsel is required to file a meritless motion to suppress or a motion for new trial merely to preserve a point for review.

The record indicates that defendant was afforded effective assistance of counsel. We find that defendant has shown neither incompetency nor the resultant prejudice necessary to be entitled to a new trial. To succeed on a claim of ineffective assistance of counsel, defendant must meet a two-prong test: (1) Defendant must show that counsel committed errors so serious that counsel was not functioning as the "counsel" guaranteed by the sixth amendment; and (2) The defendant must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) The test enunciated in Strickland was adopted by the Illinois Supreme Court in *People v. Albanese* (1984), 104 Ill. 2d 504, 525-26, 473 N.E.2d 1246, 1254-55.

The reviewing court should indulge a strong presumption that the challenged action of counsel falls within the wide range of reasonable professional assistance. (*People v. Colley* (1988), 173 Ill. App. 3d 798, 528 N.E.2d 223.) The adequacy of counsel's performance is to be determined on the basis of the totality of his conduct at trial, rather than on isolated events or acts. (*People v. Ayala* (1986), 142 Ill. App. 3d 93, 97, 491 N.E.2d 154, 158.) In examining counsel's performance,

a reviewing court shall not extend its inquiry into areas involving the exercise of judgment, discretion, trial tactics or strategy. (*Ayala*, 142 Ill. App. 3d at 97, 491 N.E.2d at 158.) Whether or not a motion to suppress should be filed is a matter of trial tactics which seldom have any bearing on issues of incompetency of counsel. (*People v. Purnell* (1984), 126 Ill. App. 3d 608, 624, 467 N.E.2d 1160.) The defendant is entitled to competent, not perfect, representation, and the fact that in retrospect a tactic proved unsuccessful does not demonstrate incompetence. *People v. Schmidt* (1988), 168 Ill. App. 3d 873, 522 N.E.2d 1317.

▪ In the present case, defense counsel made an oral motion *in limine* to bar testimony about an event in Hammond, Indiana. The State noted this evidence was motive of a crime, but agreed not to have any witnesses testify that Gonzalez was in Indiana. Defense counsel presented an opening argument. He extensively cross-examined each of the State's witness' testimony, eliciting testimony that showed inconsistencies as well as potential biases. He objected to improper remarks and argued at sidebar conferences. Defense counsel presented a witness during its case in chief whose testimony opposed that of several State witnesses. Finally, defense counsel made a closing argument and argued for a mistrial based on remarks made in the prosecutor's closing argument.

To establish the second prong of the *Strickland* test, the defendant must show that counsel's errors were so serious as to deprive the defendant of a fair trial. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) To demonstrate prejudice,

> "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.)

A court is not required to determine whether counsel's performance was competent, before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. (*People v. Albanese* (1984), 104 Ill. 2d 504, 525-27, 472 N.E.2d 1246, 1256-58.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

The record in this case supports neither portion of the test. In light of the overwhelming evidence of guilt, we do not believe that the reversal of defendant's conviction is supported in the present case.

Finally, we would conclude that the cumulative effect of alleged errors did not deprive the defendant of a fair trial. The Illinois Supreme Court has held repeatedly that the identification testimony of a single eyewitness is sufficient to sustain a conviction (*People v. Hayes* (1990), 139 Ill. 2d 89, 564 N.E.2d 803.) Here two victims, one deceased, identified Gonzalez. Their testimony was bolstered by the testimony of police officers and other evidence. This evidence overwhelmingly established Gonzalez's guilt of serious crimes.

## VI

Finally, defendant argues that he was denied a fair sentencing hearing where the trial court relied on improper factors and a biased personal attitude toward sentencing in murder cases, and where the court's comments were comparable to comments which the court made in sentencing codefendant, Orlando Rosa, who recently won a new sentencing hearing on appeal on similar grounds.

In sentencing the defendant, the court stated:

"THE COURT: The Court has considered the presentence report and the statement of counsel and the evidence heard on the trial of this case. It was the victim here who knew that this defendant was the person perhaps among others who shot, and shot him repeatedly.

And this was typically a Chicago street gang murderous assault. It was typically mindless, stupid, cowardly, callous, and for no other reason but this mindless street gang conflict which is—there has been nothing more stupid or cowardly ever conceived of than this continuous street gang rivalry in this city. But there is nothing, it was a cold blooded shooting and murder.

There is no mitigation of any kind, none conceivable. And the law in its provisions, sentencing provisions is more than generous in setting the maximum term of 40 years and then allowing for half of that time to become good time. Many believe it to be inadequate, but the Court can see no reason to impose any other sentence."

The court's sentencing decision was comparable to the remarks made by the same trial court in sentencing Gonzalez's codefendant, Orlando Rosa. Those remarks were held to be in error and grounds

for a new sentencing hearing in Rosa's appeal, *People v. Rosa* (1990), 206 Ill. App. 3d 1074, 565 N.E.2d 221.

Defendant acknowledges that some of the factors relied on by the trial court in *Rosa* did not appear in the present case, *i.e.*, that Rosa was born out of wedlock such that his life began "with the stupidity and slutliness [*sic*] of women who give themselves over to unresponsible men who are gone when the children that these great love affairs produce are born or shortly afterwards." (*Rosa*, 206 Ill. App. 3d at 1079, 565 N.E.2d at 225.) However, defendant maintains that other comments by the court in the present case are comparable to the comments held to be error in *Rosa*, thus indicating that the trial court's decisions in both cases were premised on similar considerations. In *Rosa*, the court emphasized the stupidity and cowardice of street gang members as well as that the shooting was "as bad as * * *, if not identical, it's the same as hundreds of other murders * * * committed in this city." (*Rosa*, 206 Ill. App. 3d at 1080, 565 N.E.2d at 225.) Additionally, in *Rosa* the trial court further stated that the law was "woefully inadequate" and "miserabl[y] failing its citizens" with the result that hundreds of thousands of people were leaving the city, "[a]nd the population of the kind of people who produce street gangs continues to increase." (*Rosa*, 206 Ill. App. 3d at 1080, 565 N.E.2d at 225.) The appellate court in *Rosa* held that the court "did not consider the requisite statutory factors and, therefore, failed to follow the mandate of the Unified Code of Corrections." *Rosa*, 206 Ill. App. 3d at 1084-85, 565 N.E.2d at 228, citing Ill. Rev. Stat. 1985, ch. 38, par. 1005—4—1(a).

■ Although we agree with the prosecutor that the trial judge's comments are not as grievous in this case as they were in his codefendant's case, we must find that the court failed to consider the requisite statutory factors and therefore failed to follow the mandate of the Unified Code of Corrections. Consequently, defendant's sentence is vacated and the cause is remanded to the trial court for resentencing.

Affirmed in part, vacated in part and remanded in part.

McNULTY, P.J., and GORDON, J., concur.